ROBERT SMITH, Plaintiff-Appellant, *v.* WEST SUBURBAN TRANSIT LINES, INC., Defendant-Appellee.

(No. 60636;

First District (5th Division)—March 14, 1975.

Reibman and Hoffman, Ltd., of Chicago (Sheldon N. Reibman and Burton L. Hoffman, of counsel), for appellant.

Beverly, Pause, Duffy & O'Malley, of Chicago (Frank J. Pause, John J. O'Malley, and Dom J. Rizzi, of counsel), for appellee.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

This appeal arises out of a personal injury action wherein plaintiff, a passenger on a chartered bus of defendant, alleged he was assaulted by a stranger who became angry when the bus obstructed traffic in such a fashion that the stranger's car could not proceed.

At the close of plaintiff's case, defendant's motion for a directed verdict was granted and the only issue presented on appeal is the propriety of this ruling. The facts are essentially as follows:

On April 27, 1969, plaintiff, a deacon of the St. Paul Baptist Church, was on the bus returning from a church-sponsored outing. When the bus arrived at the church on South Union Street, the driver pulled the bus into the curb at such an angle that the rear of the bus extended across the center line of the street, blocking traffic in both directions.

A few moments after the bus stopped a man, later identified as Mudd, approached the bus and, in a profane, loud manner, told the bus driver to move the bus so that his car could pass.

Mary Johnson, a church member on the bus, testified that Mudd entered the bus and told the driver to move the bus, using "words stronger than damn." On cross-examination, she stated that Deacon Smith and some of the other church members tried to induce Mudd to leave the bus, but that the driver did not do or say anything.

Corienne Jones, also a church member on the bus, saw a stranger (Mudd) come up in the bus and start "hollering" at the driver and telling him to move the bus. The driver did not move the bus nor did Mrs. Jones hear him say anything. The stranger left the bus and Mrs. Jones got off. She did not see the stranger when she disembarked.

Plaintiff testified that Mudd came up to the bus and demanded that it be moved. He was using "all kinds of filthy words." He said, "If you

don't move the bus I am going 'to do this and that'," using cusswords. He was "talking to the bus driver, from back to the bus driver, back to the passengers." The bus driver did not say anything. Mudd then left the bus. Plaintiff could not tell where he went but thought he was gone. Plaintiff then started to get off the bus when it was "my time to move." The pastor, the associate minister, Reverend Gary, and another deacon had already left the bus. Plaintiff stated, on cross-examination, that the pastor had gone to make a call to the police. By the time plaintiff reached the front of the bus and was at the top of the steps next to the driver, Mudd had returned. Mudd then grabbed plaintiff around the waist, and another man accompanying Mudd began twisting plaintiff's leg and banging it against the door frame of the bus. Plaintiff was holding onto the pole of the bus connected to the door. He estimated the scuffle lasted a couple of minutes or more, but in a deposition he had stated that Mudd's friend held onto his leg for only a few seconds.

Plaintiff's last witness was Robert Gary, an associate minister of the church. He stated that he was the first person off the bus. It faced south on Union Street but was pulled into the curb in such a manner as to block traffic on Union in both directions. There was a car going north on Union which stopped, and a man (Mudd) got out of the car, came over to the bus, and asked the driver to move. When the driver did not reply, Mudd, who appeared to be drunk, said, "Move this 'so and so' bus" and then yelled, "I will have to have it moved" and went back to his car. Gary then testified, "[H]e [Mudd] had a partner, and his partner got out of the car and picked up an iron pole." Together they returned to the bus. Gary was standing outside the bus. To his knowledge, no one else had left the bus. He estimated four or five minutes passed from the time Mudd first came over to the bus until he returned. When Mudd and his partner returned to the bus, they both stepped into it at practically the same time. A couple of seconds passed from the time they entered the bus until Gary saw Mudd's companion pulling Mr. Smith's leg. From the time the stranger started pulling on Smith's leg until they landed in the street, a matter of seconds passed.

As a result of this incident, plaintiff sustained a broken leg and was unable to work for several months after the incident.

After plaintiff rested his case, defendant's motion for a directed verdict was granted for the reason that the occurrence took place so quickly that the bus driver had no reasonable opportunity to do anything.

OPINION

■■ It is well settled in Illinois that a verdict should be directed only where all the evidence viewed in its aspect most favorable to the party opposing the motion so overwhelmingly favors the moving party that no

contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513-514. ■■ A carrier is liable for an assault on a passenger by a stranger if the assault could have been anticipated and prevented by the exercise of reasonable care and diligence. (*Neering v. Illinois Central R.R. Co.*, 383 Ill. 366, 50 N.E.2d 497.) Because of the high degree of care which a carrier owes to its passenger, it will be considered negligent (a) if the assault is reasonably foreseeable; and (b) if it could have prevented the injury and failed to do so. (*Chicago & Alton R.R. Co. v. Pillsbury*, 123 Ill. 9, 14 N.E. 22; *Watson v. Chicago Transit Authority*, 133 Ill.App. 2d 380, 272 N.E.2d 690, *rev'd on other grounds*, 52 Ill.2d 503, 288 N.E.2d 476; *Sue v. Chicago Transit Authority* (7th Cir. 1960), 279 F.2d 416.) In *Neering*, the court at page 378 cites with approval the rule of *Exton v. Central R.R. Co.* (1898), 62 N.J.L. 7, 42 A. 486, aff'd (1899), 63 N.J.L. 356, A. 1099, that:

> " 'Carriers of passengers are bound to exercise the utmost care in maintaining order and guarding those they transport against violence from whatever source arising, which might be reasonably anticipated or naturally expected to occur. * * * The carrier must exercise the care required to protect the passenger from violence even by a stranger. * * * The general rule is clear that from whatever source the danger may arise, if it be known or should have been known, care must be exercised to protect the passenger from that danger!' "

In *Letsos v. Chicago Transit Authority*, 47 Ill.2d 437, 265 N.E.2d 650, involving an attack by one passenger upon another, the Supreme Court made the following statement of the law at page 441:

> "As a common carrier, the defendant was bound to exercise a high degree of care toward its passengers and this included the responsibility to prevent injuries which could have been reasonably foreseen and avoided by the carrier. [Citations.] A carrier will be held liable for an assault by one passenger on another or for misconduct by one passenger which causes injury to another where the carrier has reason to anticipate the incident, and fails to exercise the degree of care and vigilance practicable under the circumstances to prevent the injury."

There, the court held that the driver had acted reasonably in refusing to allow a possibly unruly man to reenter the bus and that the events which then transpired occurred so swiftly that the driver had no opportunity to prevent the occurrence. Thus, the directed verdict for defendant was proper.

In contrast, *Watson v. Chicago Transit Authority*, 52 Ill.2d 503, 288

N.E.2d 476, involved a situation in which an intoxicated passenger boarded a bus and demanded change from plaintiff, a fellow passenger. When plaintiff refused, the man drew a gun precipitating a scuffle which lasted while the operator drove four or five blocks. As the struggle moved to the rear of the bus and into the rear doorwell exit, the driver released the door. The gun then discharged, striking plaintiff in the abdomen, and the combatants fell into the street through the open door. The driver stopped his vehicle a short distance away, allowed the remaining passengers to disembark, and then locked himself inside the bus. The trial court directed a verdict for defendant, the appellate court affirmed (133 Ill.App.2d 380, 272 N.E.2d 690), based on the authority of *Letsos* and because it was the court's belief that the attack was not reasonably foreseeable. The supreme court reversed, however, citing the rule in *Letsos* but concluding, at page 506:

> "We cannot agree that the facts of the present case, as established by plaintiff's evidence, so favor defendant that no contrary verdict could stand."

Here, the trial court was apparently of the opinion that the attack upon plaintiff happened so fast that it could not have been anticipated or prevented. Our inspection of the evidence adduced in the record, when viewed in a light most favorable to plaintiff, leads us to a different conclusion.

The evidence indicated that the bus was stopped facing southwest. Mudd's car was coming from the south and stopped across an intersection. Mudd appeared to be drunk, and he swore and threatened the driver. Further, plaintiff testified on cross-examination that the pastor was not there to assist plaintiff during the altercation, because he had left the bus to call the police. Yet, viewing the evidence in a light most favorable to plaintiff, one could infer that the initial confrontation seemed serious enough to the pastor to prompt his call to the police. In any event, it could have been viewed as serious enough to at least have prompted the driver to keep watch on Mudd, to give warning of his return or to take some action to prevent possible injury to a passenger.

■■ From plaintiff's testimony, it would seem that Mudd's wrath was addressed not only at the driver but also at the passengers. Plaintiff testified Mudd "was talking to the bus driver, from back to the bus driver, back to the passengers." Further, in view of the fact that the passengers were getting off the bus, it would seem that the driver should reasonably have anticipated some injury to a passenger should Mudd return to "have the bus moved." Mudd's return to his car, his reappearance with a friend and an iron pole all were visible to Reverend Gary,

and, since the bus was facing in a southwesterly direction and Mudd's car was facing north, it would seem that Mudd's actions should have been readily visible to the driver through the front or side window of the bus. This is particularly so in view of the testimony that the driver never left his seat. Once Mudd's threat to have the bus moved was made known to the driver, he was on notice of the possibility of danger to the passengers. A jury could have found him negligent on the theory that, after Mudd's threat, it was reasonably foreseeable that he might return and, if he attempted "to have the bus moved," that injury to a passenger might result. Under these circumstances, had he observed the return of Mudd and his companion, carrying the iron pole, the driver could have taken some action to prevent the attack by closing the door, by warning the passengers to stay on the bus, or by moving the bus.

For these reasons, we cannot agree that the facts of the present case, when viewed in a light most favorable to plaintiff, so favor defendant that no contrary verdict could stand. When so viewed, the jury could have found that the assault was reasonably foreseeable and could have been prevented by the driver. (*Pillsbury*; *Watson*; *Sue*.) Accordingly, the judgment is reversed, and this cause is remanded for a new trial.

Reversed and remanded.

DRUCKER and LORENZ, JJ., concur.