FRED McCOY, Plaintiff-Appellee, *v.* THE CHICAGO TRANSIT AUTHORITY, Defendant-Appellant.

First District (5th Division)    No. 62961

Opinion filed December 30, 1976.

Sal Bianchi, John J. O'Toole and J. Richard Station, all of Chicago, for appellant.

Frank J. Mackey, Jr., of Chicago (Sidney Z. Karasik, of counsel), for appellee.

Mr. PRESIDING JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, judgment was entered in favor of plaintiff

awarding him $85,000 damages for injuries he sustained after he was assaulted by three fellow passengers on a train operated by defendant Chicago Transit Authority (C.T.A.). Defendant's liability was predicated upon its supposed failure to reasonably anticipate and prevent the assault. On appeal, defendant contends that the verdict is against the manifest weight of the evidence and contrary to law.

At trial the following pertinent facts were adduced.

*For the plaintiff:*
*Fred McCoy on his own behalf*

On October 14, 1970, he left work at about 12 or 12:15 a.m. and headed home. Catching a northbound Howard-Englewood el at 43rd Street, he entered the lead car, walked to the rear, and sat down. The motorman and two other passengers were also in this car. As the train left the next stop, Indiana Avenue, he heard talking, name calling, and commotion coming from the car behind him. Sometime after hearing this noise, three men approached him. Two of the men wore Marine uniforms and the third man was dressed in a blue suit. In his opinion, they were drunk. One of the Marines attempted to shake hands with him, but he refused. The man then called him "a bunch of dirty names." One of the other men called him an "Uncle Tom." Then one of them hit him. He tried to defend himself, however, "all at once" they were on top of him. He denies provoking the fight. The last thing he remembers is being on the floor struggling. He did not see the motorman or the conductor do anything.

A police officer arrived, informed him that his leg was broken, and helped him off the train. The men were arrested and he was taken to Mercy Hospital.

On cross-examination he stated he could not actually see the motorman—only "the box he was in." The conductor was somewhere behind him in another car, although he never actually saw him either. He also stated that the three men approached him as the train left the 35th Street station.

*Emanuel Rodgers*

He was the conductor on the train in question. There were four cars on this train, manned by himself and the motorman. Among other stations, the train stopped at Indiana Avenue, 35th Street and 22nd Street. Thirteen blocks separated the 35th and 22nd Street stations.

He works from a conductor's "station" equipped with a device to open the door and a buzzer to the motorman. Two buzzes means "proceed"; three means "stop"; and four means "stop we have a disturbance." The conductor's "station" contains no equipment which would enable him to

speak with anyone; however, the motorman is in radio contact with C.T.A. headquarters which can reach help as needed.

There were few passengers on the train that night. He was alone on the fourth car and only one man was in the third car. At Indiana Avenue three men in their early 20's boarded the train. They were noisy and talking loudly; however, he is not sure what they were saying.

The 35th Street station is to the left of the train. Because the controls for the doors on the left are in the southwest corner of the third car, he headed to that "station" as the train left Indiana Avenue. Walking toward the third car, he noticed that two of the men seemed as though they wanted to find seats, while the third man, who was in the uniform of the Marine Corps walked toward the lone passenger in the third car. As he came into the car, he heard the two men say to the third man, "Leave him alone" and the passenger say, "Don't bother me."

He has no idea what caused the passenger to say this. He did not hear the men say anything to the passenger. Although he did not know how they were bothering the man, he assumed they were. He approached the men and warned them to "cool it" and not to bother the passengers. The men proceeded toward the front of the car and sat down. They were still talking loudly.

Other than this warning, he did not talk with the men, nor did he have occasion to make a judgment as to their sobriety.

As the train approached 35th Street the men got up and went into the second car. The train stopped and he let passengers on and off. After the train started up again, he began walking back to the fourth car where the control unit for the next stop was located. However, out of curiosity he turned around and walked north toward the second car. He was "more or less looking to see where the * * * three passengers had gone," because as he stated, he was "somewhat alarmed" because "they were talking loud."

As he reached the north end of the third car, he noticed a commotion in the second car. At this time the train was halfway between the 22nd and 35th Street stations. One of the uniformed men and a passenger were fighting. He yelled at them to break it up; however, they continued to fight. The passenger slipped and one of the uniformed men began to kick him. He grabbed the uniformed man by the shoulders, but could not pull him off. He then ran back and buzzed the motorman. By this time they were nearing 22nd Street and the motorman stopped the train. He then ran to get the policeman stationed at the 22nd Street stop.

At first he denied that he thought that the men were "apparently bent on mischief" when they first boarded the train. However, after a portion of his deposition of December 8, 1971, was read to him, he admitted

saying this at the deposition. He also acknowledged that when he found the men bothering the first passenger, he could have signaled the motorman or sent the men to the fourth car.

### Timothy O'Mahoney

He is a C.T.A. security officer, whose duty it is to patrol C.T.A. property. When he first took the job in 1966, the emphasis was on protecting employees and passengers. Now, however, the emphasis is toward protecting property.

He is familiar with that portion of Chicago on the Englewood line extending from Indiana to 22nd Street. At the time of this occurrence this area had a high incidence of crime on the el trains.

He is also familiar with the C.T.A.'s rules for operating employees, which includes conductors. In particular, he is familiar with Rule 13 which reads:

> "Any employee of the Authority who discovers a condition which imperils the safety of passengers, employees or the welfare of the Authority, must correct it himself if possible or be assured that it is corrected or immediately notify the radio dispatcher."

The radio dispatcher is the supervisor who controls the operation of the C.T.A. He answers questions for assistance from motormen. The dispatcher can give them any orders he deems appropriate and can send help if necessary.

### William J. Harper, Chicago Policeman

On October 14, 1970, he was assigned to the C.T.A. station at 22nd and State Streets on the Englewood-Howard line. He patrolled the platform, the stairs and area where the fare collector stays.

In 1970 there were police assigned to all of the upper structures from Harrison Street South. Also two-man police teams rode the el.

When the train in question pulled into the station at 22nd Street, he was downstairs. The conductor came down and said there was an altercation on the train. On his way upstairs he called for help on his 2-way radio. Entering the train he saw plaintiff and two Marines in uniform. He attempted to interrogate the Marines as to what occurred, however, they were intoxicated. They were very boisterous and loud like people who had been drinking.

On cross-examination he stated he spent only a couple of minutes talking with the two Marines. They were very surly and uncooperative, so he did not bother them further. He then tried to get information from plaintiff and the conductor. The Marines were using a lot of profanity. Finally they pushed past them and went out onto the platform and walked toward the stairs as if to leave. They showed complete disrespect

for him and left "as if on their own." He could not detain them.

His conclusion of intoxication was based on the actions of the parties and the odor he could smell on them. As soon as he confronted them and started talking to them he could tell they had been drinking. He also noticed that they staggered when they walked.

Although he could tell if a person had been drinking quite readily, he thought he would be a better judge of this than a person who had not come in contact with intoxicated persons frequently.

*For defendant:*

*Thomas Stiglic*

He is Director of Instruction for the C.T.A. Conductors receiving training regarding Rule 13 on Conditions Imperiling Safety.

He doesn't know of any circumstances in which the C.T.A. could prevent a passenger from riding their equipment. When pressed on this point, however, he said he would commend an employee for refusing to allow a passenger with a rifle to board a train.

On redirect examination he stated that his employees are not expected to risk their lives. Accordingly, they are not to challenge anyone.

*Norman Graver*

He is a General Operations Analyst for the C.T.A., where he has been employed the past 29 years. In 1970 he was assistant superintendent for the C.T.A. police department. His primary function is to protect property. He had 62 men under his command in patrol cars assigned to specific areas.

Since 1967 his men have not ridden the trains. The Chicago Police Department has 300 men assigned to C.T.A. duty of which some are assigned to various stations.

OPINION

■■ Both parties agree on the liability of a carrier for an assault on a passenger by a stranger. "Because of the high degree of care which a carrier owes its passengers, it will be considered negligent (a) if the assault is reasonably foreseeable; and (b) if it could have prevented the injury and failed to do so. [Citations.]" (*Smith v. West Suburban Transit Lines, Inc.* (1975), 27 Ill. App. 3d 220, 223, 326 N.E.2d 449, 451.) Applying this rule to the facts here, defendant contends that the verdict is against the manifest weight of the evidence. Specifically, it argues that the attack was neither foreseeable nor preventable.

Although the appellate court will not substitute its judgment for that of the trier of fact, "[i]t is our duty to review the evidence, and to reverse the judgment of the trial court whenever we find such judgment to be clearly

against the manifest weight of the evidence." *Thomas v. Le Burkian* (1973), 10 Ill. App. 3d 742, 744, 295 N.E.2d 313, 314-15.

■■ After reviewing the record here we have concluded that the judgment is clearly against the manifest weight of the evidence. Our analysis of the record leads us to the conclusion that the conduct of the assailants prior to this incident was not of sufficient magnitude or of a character to suggest the subsequent violent attack on plaintiff.

Plaintiff cites assailants' loud conduct, intoxication, and annoyance of another passenger as factors which should have put the conductor on notice as to their violent propensities. He claims that this should have been all the more apparent because of the high crime rate in the community. Moreover, he argues, the conductor was aware of such propensities as evidenced by his acknowledgment that he thought the assailants were "apparently bent on mischief" when they boarded the train and his subsequent curiosity regarding their activities when they entered the car in which plaintiff was riding.

Although it appears from Officer Harper's testimony that the assailants were intoxicated, the conductor testified he was unaware of this, having had no conversations or close contact with the men. Admittedly they were loud; however, loudness in a group of young men is not uncommon nor does it necessarily indicate the onset of violence. Similarly the fact that they verbally annoyed a passenger does not suggest the likelihood of a later physical attack on another passenger. This is especially true in light of the fact that, when warned to "cool it," the men promptly and obediently responded by taking their seats. To have summoned the police and have the men detained or arrested at this point would have been presumptuous. The conductor reasonably assumed that his cautionary remarks were adequate and expected no further problems.

Apparently plaintiff believes that the movement of the assailants into his car should have put the conductor on notice as to what finally happened. However, the record reveals that this movement occurred as the train approached the 35th Street station, while the conductor was preoccupied with other duties. As soon as the conductor had closed the doors at 35th Street, he walked to the car ahead to check on the men. Upon discovering a disturbance he immediately attempted to intervene at considerable risk to himself and when that failed he promptly notified the motorman. Unfortunately, by this time the train was between 35th Street and the next stop. Consequently, the motorman proceeded to that stop, where the conductor summoned police.

What more the conductor could have been expected to do we do not know. Prior to the attack he had little indication of what was forthcoming (at least nothing to require removing the assailants from the train) and as soon as it occurred the conductor did all that could reasonably have been

expected of him. The incident causing plaintiff's injury occurred so quickly and unexpectedly that the conductor acting with the highest degree of care under the circumstances could not have averted it. *Letsos v. Chicago Transit Authority* (1970), 47 Ill. 2d 437, 443, 265 N.E.2d 650, 653.

The factors enumerated here, even considered in light of the fact that the train was in a high crime area, did not give the C.T.A. reason to anticipate the attack on plaintiff.

The judgment of the circuit court is reversed.

Reversed.

SULLIVAN and DOWNING, JJ., concur.