(No. 49310.-

FRED McCOY, Appellant, v. CHICAGO TRANSIT AU-
THORITY, Appellee.

*Opinion filed Nov. 30, 1977.—Rehearing denied Jan. 26, 1978.*

Frank J. Mackey, Jr., of Chicago (Sidney Z. Karasik, of counsel), for appellant.

Edward J. Egan, John J. O'Toole, and J. Richard Stanton, of Chicago, for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Fred McCoy, brought suit against the defendant, Chicago Transit Authority (CTA), after he, while riding the CTA's Howard-Englewood elevated train in the city of Chicago, was injured in an assault by a fellow passenger. Following a jury trial, the circuit court of Cook County entered a judgment upon the jury's verdict in favor of the plaintiff. The appellate court reversed the judgment, finding it to be clearly against the manifest weight of the evidence (44 Ill. App. 3d 939), and this court granted plaintiff leave to appeal.

Plaintiff testified that on October 14, 1970, he left work at about 12 or 12:15 a.m. He boarded the defendant's northbound train at the 43d Street station and sat in the rear of the first car. The motorman and two other passengers were in this car. As the train left the next stop, 41st Street and Indiana Avenue, plaintiff heard loud talking, name calling, and general commotion emanating from a car behind him. Sometime thereafter, three men entered his car: two were dressed in military uniforms and the third in civilian clothes. In plaintiff's opinion, the men were drunk. After plaintiff refused the attempted handshake of one of the men, the man called plaintiff a "bunch of dirty names" and another called him an "Uncle Tom." Plaintiff told the men to leave him alone. One man hit him. Plaintiff

tried to defend himself, and a fight ensued. The last thing plaintiff recalled was being on the floor, struggling. He denied that he provoked the fight, and testified that he did not see either the motorman or the conductor before being struck.

A police officer arrived, informed plaintiff that his leg was broken, and helped plaintiff from the train. The three men were arrested, and plaintiff was taken to Mercy Hospital. On cross-examination, plaintiff testified the three men had approached him as the train left the 35th Street station.

The conductor, Emanuel Rodgers, testified that the train, a northbound "local," made stops at 43d Street, 41st, 35th and 22d streets; that it was composed of four cars, and manned only by the motorman and himself. The conductor performed his duties from a conductor's "station" located in each car. Each station is equipped with a buzzer system by which the conductor can communicate with the motorman: two buzzes signal "proceed," three, "stop," and four, "stop, we have a disturbance." The conductor's station contains no other communication equipment, but the motorman can, by radio, contact CTA headquarters if help is needed. It is the conductor's duty to announce the stops, check for platform markers, and activate the car doors to allow passengers egress and ingress.

There is a discrepancy in the testimony of the parties as to whether the incident which caused plaintiff's injury occurred in the first or second car. For purposes here, we will relate the facts according to the conductor's testimony.

As the train pulled into the 41st Street station, the conductor was in the fourth car. After activating the doors, the conductor noticed three men board the third car. The men were in their early twenties; two were dressed in military uniforms and a third in civilian

clothes. The conductor could not recall if any other passengers boarded at that time, but he remembered the three men because they stood only 10 to 12 feet from him and were talking loudly. The train had few passengers on board and none were in the fourth car.

As the train left the 41st Street station, the conductor entered the third car. Upon entering, he noticed one of the three men telling another of that group to leave a passenger alone, and heard the passenger tell the man "Don't bother me." Although the conductor did not know what had caused the trouble, he, nevertheless, went up to a uniformed man and told him to "Cool it," and not bother the passenger. The conductor further testified that he did not have an opportunity to judge the sobriety of the men, and that there was nothing to prevent him from having ordered the three men into the empty fourth car.

The three men went to the front of the third car and momentarily took seats, but, before the train arrived at the 35th Street station, they had, according to the conductor, gotten up and entered the second car. The conductor then activated the doors at the 35th Street station.

Before returning to his station in the fourth car, the conductor, out of curiosity and because he was "somewhat alarmed" by the men's prior behavior, looked to see where the men had gone. Looking into the second car, the conductor saw that one of the uniformed men and a passenger were fighting. The conductor yelled to the men to break it up, but the fight continued. The conductor grabbed the uniformed man by the shoulder but was unable to pull him away from the passenger. By this time, the train was nearing the 22d Street station. When the train stopped, the conductor summoned a police officer, one of whom is

on duty at that station 24 hours a day.

The conductor denied that he thought the men appeared troublesome when they boarded. When, however, he was confronted with his prior deposition testimony wherein he was asked, "Is there anything particular that drew your attention to these three people that got on the train at that time," he admitted that he had responded, "apparently they were bent on mischief." He further admitted the above comment was his thought process at that time.

William J. Harper, a Chicago police officer, testified that when the elevated train pulled into the 22d Street station, he was on duty at the street level. The conductor informed him of an altercation on the train and, when Harper entered the train, he found the plaintiff and two of the three men seated. (The third man, who had by that time run from the train, was apprehended by other officers.) Harper, as he attempted to interrogate the men, concluded that they were intoxicated and noted that they showed complete disrespect for his authority. On cross-examination, Harper stated that his conclusion as to the men's intoxication was based upon their reactions and their alcoholic odor.

Timothy O'Mahoney, a CTA security officer, testified that the Englewood line, between the 41st Street and 22d Street stations, is a troublesome area with a high incidence of on-board crime.

Thomas Stiglic, director of instruction for CTA conductors, testified on behalf of the defendant that he knew of nothing that could be done to prevent a person from riding the CTA's equipment. On cross-examination, however, the witness stated he would commend a conductor who prevented a person from boarding the train if it appeared the person was going to cause trouble.

Mr. Norman Graver, a general operations analyst for the defendant, testified that since 1967 the CTA security officers have not been assigned to ride trains. This responsibility is now carried out by the Chicago police department, which has 300 men assigned to the CTA, stationed at various posts, and, in some instances, assigned to ride the trains.

Plaintiff contends that the appellate court erred in setting aside the verdict in that it substituted its judgment for that of the jury when, in fact, there was ample credible evidence to support the jury's finding. He further argues that, in reaching its decision, the appellate court ignored later supreme court precedent and, in effect, judicially legislated tort immunity for the defendant.

Defendant's common law liability for injuries sustained as the result of an assault by a fellow passenger is governed by the standards set forth in *Letsos v. Chicago Transit Authority* (1970), 47 Ill. 2d 437, 441, and *Watson v. Chicago Transit Authority* (1972), 52 Ill. 2d 503, 505, wherein the court stated:

> "As a common carrier, the defendant [is] bound to exercise a high degree of care toward its passengers and this include[s] the responsibility to prevent injuries which could have been reasonably foreseen and avoided by the carrier. [Citations.] A carrier will be held liable for an assault by one passenger on another or for misconduct by one passenger which causes injury to another where the carrier has reason to anticipate the incident, and fails to exercise the degree of care and vigilance practicable under the circumstances to prevent the injury."

For plaintiff to recover in this case, it was incumbent upon him to show that the conductor knew

or should have known that an assault on a passenger was likely, and that the conductor had ample opportunity to take preventative measures to protect all passengers but failed to do so.

Relying on the facts in *Letsos,* the appellate court found plaintiff's evidence insufficient to prove the conductor had notice of the assailant's propensity to commit an assault, and that, under the circumstances, the injury occurred so quickly and unexpectedly that the conductor, acting with the highest degree of care, could not have averted it. 44 Ill. App. 3d 939, 944-45.

The facts in the case *sub judice* are clearly distinguishable from those in *Letsos,* and are significantly similar to those presented in *Watson* and *Blackwell v. Fernandez* (1945), 324 Ill. App. 597. Therein, the courts held the issues of defendant's liability to be questions for the jury.

In *Letsos,* a passenger on a bus, while attempting to disembark, tripped over the feet of plaintiff's friend. An argument ensued, and the bus driver ordered the passenger off the bus. When the bus was midway toward the next stop, a distance of one block, another passenger, the plaintiff's friend, and the plaintiff began to argue. They were still arguing when the bus reached the stop seconds later. At that time, the driver, in his mirror, observed a short man run from the back of the bus and strike either plaintiff's friend or plaintiff. A fight ensued. With this, the driver said, he began to rise from his seat to separate the men but, before he could intervene, shots were fired injuring the plaintiff. The driver did not see the assailant but testified that the shots came from the area where the men were fighting. The fight and the discharge of the weapon occurred, the driver stated, within a matter of seconds. The *Letsos* court held that the driver, after discharging and driving away from the passenger who had tripped,

could reasonably have concluded that the possible danger of an incident of violence had passed. The court further noted that the bus traveled but one-half block between the time the second argument began and the time of the shooting, and only 30 seconds had elapsed. It concluded that, under the circumstances, the incident which caused the plaintiff's injury occurred so quickly and unexpectedly that the driver, acting with the highest degree of care consistent with the safe operation of the bus, could not have averted it. 47 Ill. 2d 437, 442-43.

In *Watson,* the bus driver had spoken to the assailant, whom plaintiff described as appearing intoxicated. The plaintiff refused the assailant's request for change and told the assailant to ask the driver. The assailant continued to demand change and then brandished a pistol. An altercation ensued. The parties struggled throughout the vehicle, and women passengers screamed. Despite this, the driver drove the bus for several blocks, and then, as plaintiff, his friend and the assailant were struggling near the rear door, the driver opened the door while the bus was still in motion. The trio fell to the ground and the gun discharged, injuring the plaintiff. The court reversed the directed verdict entered in favor of the defendant and held that, under these facts, the issue of defendant's liability was a question for the jury to decide. 52 Ill. 2d 503, 506.

Finally, in *Blackwell,* the assailant boarded a streetcar in the city of Chicago, and quarreled with the conductor about his fare. The car was crowded and the assailant insulted the passengers by using obscene and abusive language. Sometime thereafter, the assailant sat next to the plaintiff. Plaintiff asked him to move. The two quarreled; the assailant drew a knife and stabbed the plaintiff. A disinterested witness testified that neither the conductor nor the motorman did anything

at any time to protect the passengers from the assailant. The defendant argued that there was no evidence in the record to indicate that the crew in charge of the streetcar had any knowledge that the assailant was dangerous or likely to assault a fellow passenger. The court held:

> "The duty of the train crew in handling the case of a drunken and quarrelsome passenger is not always easy to determine. If the conductor did not know of [the assailant's] misconduct he was dull indeed. [Plaintiff] was a passenger entitled to the highest reasonable degree of care. It was for the jury to decide whether he received it. They decided he did not. The trial court approved. This court does not disagree." 324 Ill. App. 597, 603.

Here, unlike *Letsos,* the conductor had ample opportunity to notice the demeanor of the men and to judge their propensity to bother passengers. According to the conductor's own testimony, there were few passengers on the train and it was late at night. His duties were minimal and, according to the testimony of another witness, the area along that portion of Englewood-Howard line was considered to be troublesome. Although the conductor stated he was unable to judge the men's sobriety, he nevertheless admitted, when presented with his deposition testimony, that the men appeared to be "bent on mischief" when they boarded the train. This initial thought process was later confirmed when he entered the third car and heard a passenger tell one of the men, "Don't bother me." Although the conductor did not know the cause of the trouble, he, nevertheless, felt it serious enough to tell the man to "Cool it" and admonish him against bothering the passenger. All of this transpired before the train arrived at the 35th Street station.

The conductor knew the fourth car was empty and that he would be stationed in that car next, yet he made no effort to direct the men into that car. Furthermore, despite the fact that the men momentarily sat down in the third car, the conductor observed them enter the next car as the train approached the 35th Street station. He made no effort, before the train pulled out of the 35th Street station, to check where the men had gone. Neither did he signal for the motorman to momentarily hold the train. He admitted, however, that as the train pulled out of the 35th Street station, he, being "somewhat alarmed" by the men's prior conduct, looked into the next car to check their whereabouts. By that time, one of the men was already involved in an altercation with a passenger.

Here, as in *Watson* and *Blackwell*, sufficient evidence was presented from which the jury could reasonably have found that defendant's agent knew or should have known of the propensity of the men to cause trouble and that he had both the time and the ability to prevent the assault, but failed to take necessary precautions.

We find that under either a *Pedrick* standard (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510) or a "manifest weight of the evidence" standard, the case was properly presented to the jury and their verdict should not have been disturbed.

Accordingly, the judgment of the appellate court is reversed and the judgment of the trial court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.