MOLLIE PIPPIN, Adm'r of the Estate of Frederick Douglas Pippin, Deceased, Plaintiff-Appellant, *v.* CHICAGO HOUSING AUTHORITY *et al.*, Defendants-Appellees.

First District (4th Division)    No. 76-59

Opinion filed March 30, 1978.

Ordower & Ordower, P. C., of Chicago (Lawrence B. Ordower, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Howard T. Brinton and Robert E. Kehoe, Jr., of counsel), for appellee Chicago Housing Authority.

Clausen, Miller, Gorman, Caffrey & Witous, of Chicago (James T. Ferrini and William J. Sneckenberg, of counsel), for appellee Interstate Service Corporation.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

The plaintiff, Mollie Pippin, brought this action in the circuit court of Cook County to recover for the wrongful death of her son, Frederick Douglas Pippin, which resulted from the alleged negligence of the defendants. On October 20, 1975, the circuit court granted a summary judgment in favor of defendants Chicago Housing Authority (hereinafter referred to as CHA), and Interstate Service Corporation (hereinafter referred to as ISC). The plaintiff appeals.

On review, the plaintiff asks that this court consider two issues: (1) Whether the CHA has a legal duty to use reasonable care in preventing foreseeable injuries to persons legally in the common areas of its buildings; and (2) whether defendants CHA and ISC voluntarily assumed a duty to provide security protection for persons on CHA property and are required by law to perform such duty in a nonnegligent manner.

This court will also consider the arguments raised by the defendants: (1) That the decedent's alleged misconduct prohibits any recovery by plaintiff; and (2) that defendant CHA has statutory immunity from plaintiff's suit.

The facts, stated briefly, are as follows: On January 10, 1973, Frederick Douglas Pippin was visiting Loretta Haywood in a CHA project building located at 3983 South Lake Park Avenue, in Chicago. Ms. Haywood was a tenant in the building. At the time of the incident, two ISC employed guards, Willie Torrence and Willie Butler, were on duty at the premises. A contract existed between CHA and ISC, whereby ISC was to provide security guard service to CHA managed properties. Shortly after 6 p.m., Ms. Haywood approached Torrence and Butler in the building's lobby and requested that they assist her in removing a man (Pippin) from her apartment. The two guards informed her that she must contact the Chicago Police Department and that a public phone was located outside of the building. She then exited the lobby. When she re-entered the building, Pippin was apparently departing through the lobby. She shouted at him, "Go on out and don't come back." Pippin stopped and the two adversaries began to quarrel noisily. A struggle ensued and Loretta

Haywood stabbed Pippin in the chest with a butcher knife. When the guards were able to separate them, Pippin was dying. Butler and Torrence then summoned the Chicago Police Department and notified the ISC of what had occurred.

The plaintiff, mother of the decedent and administrator of his estate, alleged in her complaint that the building involved was part of a housing complex having a history of numerous violent and felonious crimes. Plaintiff alleged that defendant CHA had due and adequate notice of the resulting dangerous condition of the premises and, therefore, it had a duty to exercise reasonable care in the building's maintenance, control, and management for the welfare of persons legally in or about the premises. She further alleged that for such purpose the CHA had, without proper investigation and with negligence, employed the services of defendant ISC, and that ISC had negligently employed incompetent and negligent guards. According to the complaint, the ISC guards negligently stood by and watched the altercation during which Pippin was attacked and killed and took no action whatsoever to prevent his death. The guards' negligence proximately caused Pippin's death and caused his surviving heirs and next of kin to suffer irreparable pecuniary damage and loss.

In their depositions, Torrence and Butler stated that they carried firearms while on duty, and that they had received 8 weeks of training pursuant to their employment. Torrence had worked as a guard for 7 years and Butler for 8 years. Neither of the men had ever found it necessary to fire his weapon while on duty. Their training was to direct persons in need of assistance to call the city police department and to assist them in calling when necessary.

The two guards stated that they were in the process of unlocking a "mail guard" from the tenant mailboxes when Loretta Haywood returned to the building lobby after calling the police. They noticed she was wearing a sweater and slacks, but they did not observe any weapon on her person. Pippin had also entered the lobby carrying a shopping bag; he appeared to be leaving peacefully. The guards continued to unlock the mailboxes. Then, after Loretta shouted at him, Pippin turned toward her and began to beat her about the head. The two guards then immediately proceeded toward the struggling couple to separate them, but it was too late. Only after the two people had been separated did the guards see the 6-inch butcher knife in the woman's hand. They stated that the struggle and stabbing took place within minutes.

Section 57 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 57(3)), provides that a summary judgment shall be granted in a case where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The plaintiff contends that here the trial court erred when it found defendants could not be

liable to plaintiff as a matter of law and granted a summary judgment in their favor.

The plaintiff specifically contends that defendant CHA had a common law duty to provide security protection for its tenants and their guests since CHA was on notice that its project buildings were potentially dangerous for those persons. According to plaintiff, the high incidence of crime rampant throughout the various project buildings, including the building at 3983 South Lake Park, made additional crimes there foreseeable and therefore served as notice to the CHA that security protection was necessary. Plaintiff cites numerous cases in support of this contention. (*Kline v. 1500 Massachusetts Avenue Apartment Corp.* (D.C. Cir. 1970), 439 F.2d 477; *McCoy v. Chicago Transit Authority* (1977), 69 Ill. 2d 280, 371 N.E.2d 625; *Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 50 N.E.2d 497; *Stribling v. Chicago Housing Authority* (1975), 34 Ill. App. 3d 551, 340 N.E.2d 47; *Mrzlak v. Ettinger* (1975), 25 Ill. App. 3d 706, 323 N.E.2d 796.) In the alternative, plaintiff contends that defendants, by their contract, assumed the duty to provide security protection for persons lawfully on the premises of project buildings and, therefore, they were obligated to be sure that protection was afforded in a nonnegligent manner. *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199 N.E.2d 769.

Defendants deny any legal duty to provide security protection for CHA tenants or their guests whether engendered by common law or contract. Furthermore, they contend that Frederick Pippin's alleged misconduct precludes any recovery by this plaintiff. (*Zank v. Chicago, Rock Island & Pacific R.R. Co.* (1959), 17 Ill. 2d 473, 161 N.E.2d 848.) Defendant CHA also contends that it has been granted statutory immunity from plaintiff's suit on the basis of section 4—102 of the Local Governmental and Governmental Employees Tort Immunity Act (hereinafter Governmental Employees Tort Immunity Act) (Ill. Rev. Stat. 1973, ch. 85, par. 4—102) which provides:

> "Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes and failure to apprehend criminals."

## Opinion

Here, as in the case of *Trice v. Chicago Housing Authority* (1973), 14 Ill. App. 3d 97, 99, 302 N.E.2d 207, 208, the primary issue before us is whether the defendant landlord has a duty imposed by law to protect tenants and other persons legally on its property from the intentional

criminal or criminally reckless acts of other tenants or third persons. This question of the landlord's common law duty to protect has previously been resolved in the defendant's favor. *Smith v. Chicago Housing Authority* (1976), 36 Ill. App. 3d 967, 971, 344 N.E.2d 536, 540; *Trice*, at 100-01.

In *Trice*, where plaintiff failed to allege the existence of any "special relationship" that would create a legal duty to protect tenants against the criminal acts of third persons (Restatement (Second) of Torts §315 (1965)), and failed to allege facts that could support the imposition of any contractual or statutory duty to protect, this court refused to create a new common law duty through any expansion of the landlord's tort liability. (*Trice*, at 99.) The court, in effect, refused to make landlords insurers against the risk of injury from the criminal acts of third persons whenever some form of notice is alleged, and it held that:

> "In determining whether a duty exists, the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on defendant must be taken into account. Imposition of a duty does not depend upon foreseeability alone." (*Trice*, at 100.)

Therefore, we believe that in the instant case, the fact that defendant CHA may have been aware that the common areas of the project building were potentially dangerous did not engender in the defendant a legal duty to protect the deceased from criminal attack. Although, as plaintiff contends, the CHA may have been empowered to provide its tenants and their guests with such protection (Ill. Rev. Stat. 1973, ch. 67½, par. 2), as the late Justice Hayes stated in his special concurrence in *Trice*:

> "[T]he key issue is not what acts defendant is empowered to perform, but rather what acts defendant is under a common law duty to perform. It is clear that the empowerment cannot itself create the essential duty * * *." *Trice*, at 102.

■■ This court must reaffirm its prior decisions and hold that the CHA here had no common law duty to protect the deceased from the criminal acts of third persons, albeit some form of notice may have been provided, where those acts were totally independent of, and did not result from, any condition of the premises itself. (*Smith v. Chicago Housing Authority* (1976), 36 Ill. App. 3d 967, 971, 344 N.E.2d 536, 540; *Trice v. Chicago Housing Authority* (1973), 14 Ill. App. 3d 97, 100, 302 N.E.2d 207, 209.) The *Trice* court recognized that:

> "[A] lessor who retains in his own control a part of the land which the lessee is entitled to use is liable to the lessee and others rightfully on the land for physical harm caused by dangerous conditions of the land under the lessor's control, if the lessor by the exercise of reasonable care could have discovered the condition and could have made it safe." (*Trice*, at 100.)

However, the court also stated that:

"[T]he landlord's control of the common areas is associated with the obligation to maintain and repair, rather than with a duty to police." *Trice*, at 100.

The cases cited by plaintiff as contrary to *Trice* and *Smith* are not persuasive, and a majority of them have been distinguished by this court. (*Smith*, at 969-70.) In *Smith*, the court stated:

"In *Mims v. New York Life Insurance Co.*, 133 Ill. App. 2d 283, 273 N.E.2d 186, plaintiffs were tenants about to vacate their apartment at the termination of their lease. As was customary under such circumstances, defendant directed its head maintenance man to inspect plaintiffs' apartment. Though tenants were usually notified of such inspections, notice was not given in this instance. While the inspection was in progress, one of the tenants returned home and noted that the door was unlocked, though she had locked it before her departure. Upon entering the apartment, she found the defendant's employee making his inspection. After he left, the plaintiff found that a fur coat and some money were missing from a closet. This court affirmed the judgment in favor of plaintiffs, stating that 'The law imposes a duty to exercise ordinary care to guard against injury which may naturally flow as a reasonably probable and foreseeable consequence of one's act * * *. * * * [T]he act of defendant's employee in leaving the door to the apartment unlocked, open and unguarded while he made an inspection of the premises during plaintiffs' absence constituted a failure on the part of defendant to conform its conduct to the standard of duty imposed by law.' 133 Ill. App. 2d 283, 285.

In *Stribling v. Chicago Housing Authority*, 34 Ill. App. 3d 551, 340 N.E.2d 47, plaintiffs were tenants whose apartment was burglarized on three separate occasions. Each time the thieves broke through a wall which plaintiffs' apartment shared with a vacant, adjacent apartment. Plaintiffs' theory was that defendant had breached a legal duty by failing to adequately secure the vacant apartments. Noting the bizarre circumstances involved, this court held that the plaintiffs' complaint alleged that the defendant owed plaintiffs a duty to guard against the second and third burglaries because, 'after defendants had notice of the original burglary and the means used in effecting the burglary, the fact that another burglary could happen in the same fashion became eminently foreseeable.' 34 Ill. App. 3d 551, 556.

Both *Mims* and *Stribling*, cited by plaintiff, are distinguishable from the instant case. In *Mims,* defendant's employee acted affirmatively in manner which made it possible for the thief to

enter the premises. In *Stribling*, the defendant, with notice, failed to act in a manner which would reasonably have prevented further thefts in the same, unusual fashion. In addition, in both of these cases the loss inflicted upon plaintiffs was a direct result of the condition of the leased property itself. In one case we have the existence of two adjacent vacant apartments and in the other the unlocked condition of a door to the apartment. On the contrary, in the case before us, the loss was inflicted by persons unknown and had no causal or other connection with or relation to the property itself.

The same observation applies to *Johnston v. Harris* (1972), 387 Mich. 569, 198 N.W.2d 409, also cited by plaintiff. There, when plaintiff was returning home, he reached for the knob of the front door. The door was suddenly jerked open and plaintiff was assaulted and robbed by an unknown person 'lurking in the poorly lighted, unlocked vestibule.' (387 Mich. 569, 572, 198 N.W.2d 409.) The court reversed a directed verdict at the end of plaintiff's case. There the loss to plaintiff was connected with and resulted from condition of the premises which were poorly lighted and unlocked." *Smith*, at 969-70.

In *Kline v. 1500 Massachusetts Avenue Apartment Corp.* (D.C. Cir. 1970), 439 F.2d 477, the high level of security in the defendant corporation's building was a prominent factor in plaintiff's agreement to rent. After plaintiff became a tenant, security in the building was significantly reduced and plaintiff became the victim of a criminal attack while on the premises. *Kline* is not supportive of this plaintiff's position, because a contractual duty to provide security was the basis of the plaintiff's suit in *Kline*. Furthermore, the special facts in *Kline* have been held to have been a major factor in that decision. *Trice v. Chicago Housing Authority* (1973), 14 Ill. App. 3d 97, 100, 302 N.E.2d 207, 209.

Finally, the recent Illinois Supreme Court decision in *McCoy v. Chicago Transit Authority* (1977), 69 Ill. 2d 280, 371 N.E.2d 625, must be distinguished from the case at hand. Defendant in *McCoy* was classified a common carrier and plaintiff was its passenger. The relationship between the *McCoy* parties differed from the relationship in the instant case, in that the relationship involved here is that of landlord-tenant, or landlord-guest. In deciding that defendant Chicago Transit Authority does have a duty to protect its passengers from criminal attack by other passengers or third persons where notice of the danger exists, the *McCoy* court recognized the special relationship involved and the particularly high standard of care long imposed upon common carriers. The *McCoy* court reaffirmed *Watson v. Chicago Transit Authority* (1972), 52 Ill. 2d 503, 505, 288 N.E.2d 476, 478, and it stated:

" 'As a common carrier, the defendant was bound to exercise a high degree of care toward its passengers and this included the responsibility to prevent injuries which could have been reasonably foreseen and avoided by the carrier. [Citations.] A carrier will be held liable for an assault by one passenger on another or for misconduct by one passenger which causes injury to another where the carrier has reason to anticipate the incident, and fails to exercise the degree of care and vigilance practicable under the circumstances to prevent the injury.' " (*McCoy*, at 285.) However, as discussed earlier, where the defendant is a landlord the imposition of a common law duty to protect tenants and guests from the criminal attacks of third persons does not depend upon foreseeability alone. *Trice*, at 100.

■■ Although no common law duty to protect the deceased existed, we find that by the terms of their contract defendants CHA and ISC assumed a duty to exercise reasonable care in protecting persons lawfully on the premises from foreseeable criminal attacks and other foreseeable dangers. Therefore, whether or not this duty was fulfilled in the instant case was properly a question of fact that should have been presented to a jury for its consideration.

The pertinent provisions of the contract are as follows:

"THIS AGREEMENT, made this first day of November A.D., 1950, by and between the INTERSTATE SERVICE CORPORATION, an Illinois corporation, having its principal place of business at 37 West Van Buren Street, Chicago, Illinois, party of the first part, and the CHICAGO HOUSING AUTHORITY, party of the second part. * * *

WHEREAS, the party of the second part is desirous of securing from the party of the first part the services of armed guards and other protective services for the purpose of guarding its properties commonly known as the Jane Addams Houses, Altgeld Gardens, Robert H. Brooks Homes, Julia C. Lathrop Homes, Ida B. Wells Homes, Wentworth Gardens, Dearborn Homes and various other housing projects which it may from time to time acquire *and the protection of persons thereon,* * * *." (Emphasis added.)

The defendants have contended that the only duty assumed under this contract is to provide security protection for CHA managed properties, rather than for tenants and other persons on those properties. However, the language of the contract patently refutes defendants' position. The language of the contract specifically expresses the apparent intent of the contracting defendants to provide for the security protection of persons as well as the physical premises. Furthermore, in his deposition, Willie Butler stated that the guards on occasion handled disturbances in the

building, such as "Kids skating in the hallway, or playing the record player too loud, or teenagers smoking on the stairways and people can't walk through." He further stated, "We get a lot of complaints on pocketbook snatching. People breaking in the apartment and taking the televisions. When we get there, the police taking [*sic*] over." Butler admitted that, "We get a number of fights in the summer. In the wintertime not too many fights." In his deposition, Willie Torrence stated, "When we see people with weapons, we apprehend them. C.P.D. locks them up." Thus, although the Chicago Police Department is ultimately called in on potentially violent situations, the ISC employed guards do respond initially to complaints of various disturbances in the building and in the tenants' apartments, including robberies and burglaries, rather than simply monitoring the lobby and common areas to protect the property from vandalism. According to Butler, the ISC guards were trained for their position as guards with that corporation and advised how to protect themselves, the building, people, and how to care for victims of epileptic seizures. We must conclude that the defendants did undertake to provide security protection in and about the housing project for persons as well as property. The ISC guards are trained to respond and do respond to calls for help resulting from human situations, *i.e.*, those situations where a human being is in difficulty or danger. Although the law does not require that such a service be provided under the circumstances here, it does require that when provided, such service be performed with a reasonable degree of care, skill, and competence. See *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 74, 199 N.E.2d 769, 779.

■■ The defendants submit that there is no evidence in the record to refute that the CHA acted with reasonable care in arranging for the ISC services, that ISC employed and trained competent and properly equipped guards, or that the ISC guards acted properly regarding the incident in question. We disagree. Both guards stated in their depositions that they had been instructed to assist people in calling the police when necessary. However, they sent Loretta Haywood alone to a public phone located outside of the building, regardless of the fact that the temperature was "around 5 or 6°," and the woman did not have a coat. They refused to investigate the disturbance in her apartment and continued with their mailbox duties; they did not wait in order to determine if she was successful in her attempt to reach the police. There is also a question here of just how much time elapsed between the beginning of Ms. Haywood's and Pippin's lobby altercation and when the guards first moved to separate them. These and other facts evidenced in the record and alleged in plaintiff's complaint could be effectively used at trial to convince a jury that the ISC guards acted negligently in the instant case. Furthermore, whether or not the deceased was in fact guilty of any misconduct is a question of fact to be determined by a jury. Therefore, this court will not

discuss whether any misconduct on the part of the deceased would bar plaintiff's recovery in this action.

We believe that genuine issues exist here as to material facts, and that a jury could reasonably find that liability should be imposed on one, or both, of the defendants for the wrongful death of Frederick Pippin. We find that a summary judgment should not have been granted here, and we reverse that order and remand this cause for trial.

■■ We find that section 4—102 of the Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, par. 4—102), does not bar plaintiff's recovery from defendant CHA. Section 9—103 of the same Act may act as a waiver of the tort immunity asserted by the defendant under section 4—102 (*Housewright v. City of LaHarpe* (1972), 51 Ill. 2d 357, 361-62, 282 N.E.2d 437, 441), and provides as follows:

> " '(a) A local public entity may contract for insurance against any loss or liability which may be imposed upon it under this Act. * * * (b) Every policy for insurance coverage issued to a local public entity shall provide or be endorsed to provide that the company issuing such policy waives any right to refuse payment or to deny liability thereto within the limits of said policy by reason of the non-liability of the insured public entity for the wrongful or negligent acts of itself or its employees and its immunity from suit by reason of the defenses and immunities provided in this Act.' "

By the terms of the contract between the two defendants, CHA is insured within the meaning of section 9—103. Defendant ISC agreed to purchase and maintain various forms of insurance for the benefit of CHA; to hold CHA harmless from and to defend CHA against "any and all suits, claims and demands whatsoever brought by any person * * * for injuries to or the death of any person * * *." The effective status of this agreement is evidenced by the CHA's designation on its court appearance in the trial court of American Reserve as the insurer secured by defendant ISC. The immunities granted by the Act are only for the benefit of uninsured municipalities, and the purpose of section 9—103 is to prevent any insurer from avoiding liability by reason of immunities granted to uninsured municipalities. (*Housewright*, at 363.) Clearly, the purpose of section 9—103 by failure to raise this contention specifically in the trial court (*Brown v. Shook* (1971), 132 Ill. App. 2d 246, 247, 268 N.E.2d 883, 884), here there is evidence in the record that ISC did in fact procure the insurance coverage for which the parties contracted.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

LINN and DIERINGER, JJ., concur.