(No. 50773

MOLLIE PIPPIN, Adm'r, Appellee, v. THE CHICAGO HOUSING AUTHORITY *et al.,* Appellants.

*Opinion filed December 3, 1979.*

CLARK, J., concurring in part and dissenting in part.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini and Thomas H. Ryerson, of counsel), for appellant Interstate Service Corporation.

Wildman, Harrold, Allen & Dixon, of Chicago (Howard T. Brinton and Robert E. Kehoe, Jr., of counsel), for

appellant Chicago Housing Authority.

Lawrence B. Ordower, of Ordower & Ordower, P.C., of Chicago, for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

This is an action for the wrongful death of Frederick Douglas Pippin, brought by his mother, Mollie Pippin, the administratrix of his estate, against the Chicago Housing Authority (Authority), a municipal corporation, and Interstate Service Corporation (Interstate) in the circuit court of Cook County. The circuit court granted summary judgment in favor of the defendants, but the appellate court reversed and remanded. (58 Ill. App. 3d 1029.) We granted the Authority leave to appeal. (65 Ill. 2d R. 315.) Interstate joined in the appeal pursuant to our Rule 318(a). 58 Ill. 2d R. 318(a).

At issue is the extent of the Authority's duty, if any, to protect plaintiff's decedent, Frederick Pippin, a social guest, from criminal conduct which occurred on premises owned and managed by the Authority, and the duty of Interstate to protect the deceased from such conduct.

On January 10, 1973, around 6 p.m., in the lobby of a housing project owned and operated by the Authority, Loretta Haywood approached Willie Torrence and Willie Butler, employed as security guards at the project by Interstate. She asked the two guards, who were releasing a lock system on the mailboxes at the time, to remove Pippin, an acquaintance and apparently a licensee (Restatement (Second) of Torts sec. 330, comment $h(3)$ (1965)) from her apartment in the project building. They explained they were not permitted, by Interstate's policy, to become involved in any "domestic problem," and suggested she call the Chicago police. She thereupon left the building but returned to the lobby in three or four minutes. About the same time, Pippin entered the lobby

from the building's stairway. Haywood, in an audible voice, told him to "go *** and don't come back." At that, Pippin walked over to Haywood and struck her on the head more than once. The guards stopped their work at the mailboxes and, within seconds of the start of the altercation, separated the couple. Upon pulling them apart, the guards for the first time saw that Haywood was in possession of a knife and that Pippin was bleeding. According to both guards, at no time prior to the beating and knifing did either Haywood or Pippin display haste, excitement or hysteria.

At the time of the incident, a contract for security or "protective services" existed between the Authority and Interstate, and included the following language.

> "WHEREAS, the party of the second part [(Authority)] is desirous of securing from the party of the first part [(Interstate)] the services of armed guards and other protective services *for the purpose of guarding its properties *** and the protection of persons* thereon ***.
> * * *
> It is expressly understood and agreed that the party of the first part is an *independent contractor*, engaged in an independently established business and is at the present time furnishing services of the same character as are herein provided to other parties and that neither party of the first part nor any of its employees, whether engaged in rendering any of the services provided for under this contract or otherwise, shall under any circumstances whatsoever be considered as employees of the party of the second part." (Emphasis added.)

The Authority contends that it had no legal duty to protect Pippin from criminal conduct because the common law imposes no such duty; that Pippin had no special relationship with the Authority that would justify placing a burden of protection on the Authority; and that it had not assumed a duty of protection by contracting for protective services. The appellate court agreed there was no duty to protect the victim, but held that the Authority and Interstate, "by the terms of their contract ***

assumed a duty to exercise reasonable care in protecting persons lawfully on the premises from foreseeable criminal attacks and other foreseeable dangers." 58 Ill. App. 3d 1029, 1037.

"It is fundamental that there can be no recovery in tort for negligence unless the defendant has breached a duty owed to the plaintiff." (*Boyd v. Racine Currency Exchange, Inc.* (1973), 56 Ill. 2d 95, 97. Accord, *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 554-55.) The appellate court correctly states the common law in Illinois: a landlord does not owe a tenant or social guest (licensee) a duty to protect the latter from criminal acts. (58 Ill. App. 3d 1029, 1033-37; *Martin v. Usher* (1977), 55 Ill. App. 3d 409, 410-11; *Smith v. Chicago Housing Authority* (1976), 36 Ill. App. 3d 967, 969-71; *Trice v. Chicago Housing Authority* (1973), 14 Ill. App. 3d 97, 99-101. See Annot., *Liability to Social Guest Injured Otherwise Than By Condition of Premises,* 79 A.L.R.2d 990 (1961), and Annot., *Landlord's Obligation to Protect Tenant Against Criminal Activities of Third Persons,* 43 A.L.R.3d 331 (1972).) Moreover, this case does not fall into the "special relationship" exception to the general rule above. *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 559-60. *Cf. McCoy v. Chicago Transit Authority* (1977), 69 Ill. 2d 280 (common law liability existed because the defendant was a common carrier, a "special relationship" classification).

As additional support for the argument that the Authority has the duty to protect persons on its premises, plaintiff posits the following portions of two provisions of the Housing Authorities Act.

"It is hereby declared as a matter of legislative determination that in order to promote and protect the health, safety, morals and welfare of the public, it is necessary in the public interest to provide for the creation of municipal corporations to be known as housing authorities, and to confer upon and vest in said housing authorities all powers necessary or appropriate in order that they may engage in low-rent housing and slum

clearance projects, and undertake such land assembly, clearance, rehabilitation, development, and redevelopment projects as will tend to relieve the shortage of decent, safe, and sanitary dwellings." Ill. Rev. Stat. 1971, ch. 67½, par. 2.

"The State Housing Board shall thereupon issue a certificate to the presiding officer of such city, village, incorporated town or county for the creation of such authority if it shall find (a) that unsanitary or unsafe inhabited dwelling accommodations exist in such city, village, incorporated town or county, or (b) that there is a shortage of safe or sanitary dwelling accommodations in such city, village, incorporated town or county available to persons who lack the amount of income which is necessary (as determined by said Board) to enable them without financial assistance to live in decent, safe and sanitary dwellings without over-crowding." (Ill. Rev. Stat. 1971, ch. 67½, par. 3.)

The foregoing language, and particularly the phrase "decent, safe and sanitary dwellings," cannot reasonably be construed to require the Authority to provide protection from criminal activities directed against persons lawfully on the premises owned or operated by the Authority. Rather, we are convinced that this language refers exclusively to the physical condition of the premises. Annot., 43 A.L.R.3d 331, 344 (1972).

Although the Authority had no independent duty to protect against criminal acts on its premises, it voluntarily entered into a contract with Interstate, an independent contractor, by which the latter agreed to provide guard services on Authority premises. In *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 74, this court gave its recognition to the established principle that liability can arise from the negligent performance of a voluntary undertaking. The court utilized this principle to impose liability against an insurer for personal injuries suffered as a result of the insurer's negligent performance of a gratuitous inspection of the premises where the injuries occurred. Although the principle is applicable here, the

extent of the Authority's undertaking was different than that of the insurer in *Nelson*. Because the Authority did not undertake to perform the guard services itself, it cannot be held to have had a duty to protect Pippin. The Authority's duty was limited by the extent of the undertaking, *viz,* to use reasonable care in engaging Interstate to provide the guard services. The Authority can therefore be liable at most for the negligent hiring of Interstate. (Restatement (Second) of Torts sec. 411 (1965); Prosser, Torts sec. 71, at 469-70 (4th ed. 1971).) We note that plaintiff's complaint, which alleges that the Authority employed Interstate without proper investigation and with negligence, raises a question of fact relevant to the issue of the Authority's liability. Thus, summary judgment should not have been granted in favor of the Authority.

There remains the issue of Interstate's liability. As stated, Interstate contracted with the Authority to provide guard services; specifically, to provide "protective services for the purpose of guarding [the Authority's] properties *** and the protection of persons thereon." Initially, we conclude that plaintiff's action is better characterized as a tort action than as a contract action, and, as such, no privity is required. (See *Rozny v. Marnul* (1969), 43 Ill. 2d 54, 60, 62-68; *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 617; Prosser, Torts sec. 93 (4th ed. (1971).) In assessing Interstate's duty in tort owed to Pippin as a result of its contract with the Authority, we find section 324A of the Restatement (Second) of Torts to be apposite. That section states:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." (Restatement (Second) of Torts sec. 324A (1965).)

Interstate's duty does not arise under either subsection (a) or (b), as plaintiff's complaint does not allege that Interstate's conduct actually increased the risk of harm to Pippin, and, as we have already determined, there was no preexisting duty on the part of the Authority to provide protection in this instance.

Subsection (c), however, sets up reliance upon the undertaking as a separate basis for finding liability. While it appears unlikely that Pippin relied upon Interstate's undertaking, subsection (c) speaks to reliance by the third person (Pippin) or by "the other" (the Authority) (Restatement (Second) of Torts sec. 324A(c) (1965)). By contracting with Interstate for guard services, the Authority, as a matter of law, relied upon Interstate to perform its undertaking. We note the rationale for subsection (c) of section 324A, which appears in the comments to that section.

"Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." (Restatement (Second) of Torts sec. 324A, comment *e* (1965).)

Plaintiff has, therefore, satisfied the reliance requirement of section 324A(c), so as to give rise to a duty owed by Interstate to Pippin.

Interstate contends that it has not undertaken the obligation of "protection of persons" because that provision of the contract is in the preamble, at the behest of the Authority, rather than in the specific clauses of the contract. Interstate is correct, of course, in stating the general rule:

"[O]bligations and promises of the parties in the operative portion of a contract prevail over a

preliminary recital or preamble." (*Brookens v. Peabody Coal Co.* (1957), 11 Ill. 2d 322, 325.) Interstate argues that the "operative portion" of the instant contract expresses something which contradicts, qualifies, or derogates the preamble and its stated purpose of "protection of persons." That, however, is not the situation. The operative clauses of the contract simply provide, in specific ways, for the implementation of the purposes set out in the preamble. We conclude that Interstate assumed the duty, owed to persons lawfully on the Authority's property, of exercising reasonable care in the performance of its contracted obligation of "protection of persons." It is for the trier of fact to determine if that duty was breached.

For the foregoing reasons, the judgment of the appellate court, reversing the circuit court and remanding the cause, is affirmed.

*Judgment affirmed.*

MR. JUSTICE CLARK, concurring in part and dissenting in part:

I agree with the majority that the Authority, as landlord, has no common law duty to protect a tenant or social guest from criminal acts. I disagree with its conclusion that the Authority has no statutory duty to do so. Hence, I dissent in part.

I believe the Authority is commanded by the legislature to exercise reasonable care to protect tenants and others (including licensees and invitees), lawfully on the premises owned or operated by the Authority, from foreseeable criminal acts. (Contra, Annot., 43 A.L.R.3d 331, 344 (1972). But see 1 J. Dooley, Modern Tort Law 385 (1977) (hereafter Dooley).) In the Housing Authorities Act (Ill. Rev. Stat. 1971, ch. 67½, pars. 1 *et seq.*) (hereafter Act) the legislature provided for the creation of a "housing authority" (Ill. Rev. Stat. 1971, ch. 67½, par. 3) which "shall be a municipal corporation and shall

constitute a body both corporate and politic, exercising public and essential governmental functions, and *having all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this Act,* including, in addition to others herein granted, the powers enumerated in Sections 8.1 through 8.8, inclusive." (Emphasis added.) (Ill. Rev. Stat. 1971, ch. 67½, par. 8.) (See Ill. Rev. Stat. 1971, ch. 67½, pars. 8.1, 8.2.) The public policy of this State, as well as the purposes of the Act, are clearly set out in section 2 of the Act:

> "It is hereby declared as a matter of legislative determination that *in order to promote and protect the health, safety, morals and welfare of the public,* it is necessary in the public interest to provide for the creation of municipal corporations to be known as housing authorities, and to confer upon and vest in said housing authorities all powers necessary or appropriate in order that they may engage in low-rent housing and slum clearance projects, and undertake such land assembly, clearance, rehabilitation, development, and redevelopment projects as will tend *to relieve the shortage of decent, safe, and sanitary dwellings;* and that the powers herein conferred upon the housing authorities including the power to acquire and dispose of improved or unimproved property, to remove unsanitary or substandard conditions, to construct and operate housing accommodations, to regulate the maintenance of housing projects and to borrow, expend, loan, invest, and repay monies for the purposes herein set forth, are public objects and governmental functions essential to the public interest." (Emphasis added.) (Ill. Rev. Stat. 1971, ch. 67½, par. 2.)

Section 24 is also relevant:

> "It is hereby declared to be the policy of this State that each housing authority shall manage and operate its housing projects in an efficient manner so as to enable it to fix the rentals for dwellings at the lowest possible rates consistent with *its providing decent, safe and sanitary dwellings,* and that no housing Authority shall construct or operate any such project for profit, or as a source of revenue to a city, village, incorporated town or county.

***" (Emphasis added.) (Ill. Rev. Stat. 1971, ch. 67½, par. 24.)

It is clear that the Authority specifically (and obviously not landlords generally) is charged with the responsibility to provide "decent, *safe,* and sanitary" low-income housing. It may be argued that *safe* is limited to a description of the physical condition of the premises. I do not think, however, the legislature intended so narrow a construction of the word *safe,* nor intended to have housing authorities construct and operate housing projects in a vacuum, oblivious to the realities of urban—especially poor urban—living. *Safe* encompasses both the physical and social conditions of the premises. Indeed, the second paragraph of section 2 of the Act unequivocally supports this view:

> "It is further declared as a matter of legislative determination that the crucial *housing shortage* which prevails throughout the State has contributed and *will continue to contribute materially toward an increase in crime, juvenile delinquency,* infant mortality, and disease; *that by reason thereof it has become a social and economic imperative to broaden the powers of housing authorities* with respect to the acquisition of property, the construction of housing accommodations, and the assembly, clearance and sale or other disposition of property acquired for development or redevelopment by persons, firms and corporations; that the provisions of this Act are grounded in public necessity and predicated upon serious emergency conditions requiring immediate consideration and action, and that this amendatory Act embraces public objects and governmental functions essential to the public interest." (Emphasis added.) (Ill. Rev. Stat. 1971, ch. 67½, par. 2.)

The legislature clearly established a duty to protect those lawfully on the Authority's premises.

I share the Authority's concern that it has been given an "impossible" task by the legislature. Although the reasoning in *Lance v. Senior* (1967), 36 Ill. 2d 516, 518, was applied to the issue of the existence of a common law duty (rather than a statutory duty as we have found here),

it is instructive here: "whether the law imposes a duty does not depend upon foreseeability alone. The likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon the defendant, must also be taken into account." All parties here acknowledge that low-income housing projects, as here, are the scenes of frequent, tragic crimes, recklessness and violence. (The Authority acknowledges this by arguing it should not be made responsible for acts which are the result of complex socio-economic factors.) Foreseeability and likelihood of injury, resulting from such acts, are not actually disputed here. The burden and consequences are the source of contention. Undeniably, the burden placed on the Authority by the statutory duty is heavy. Even so, the Authority has recognized its obligation by contracting for protective services; since 1950, when the Authority entered into an agreement with Interstate, it has borne the burden of protection of people and property. Despite the pervasive existence of crime in the projects, who can say that, over the long-run, the Authority has failed to meet its statutory duty? The presence of armed, uniformed protective services may have provided needed psychological comfort—and deterrence. The complexity of socio-economic problems of urban existence should not deter the Authority from exercising or attempting to exercise with reasonable care the duty to provide safe housing as mandated by the legislature.

I do not disagree with the majority's characterization of plaintiff's action as a tort action apropos of the liability of Interstate. However, my lack of disagreement with the majority is not to the exclusion of characterizing plaintiff's action as a contract action. Interstate, an independent contractor, by entering into the contract with the Authority to "provide protective services for the purpose of guarding [the Authority's] properties *** and the protection of persons thereon," *voluntarily* assumed the obligation of protecting persons lawfully on the Authority's

property. In doing so, Interstate owed the duty of exercising reasonable care, in the performance of this voluntarily contracted obligation, to persons lawfully on the Authority's property. "[L]iability can arise from the negligent performance of a voluntary undertaking." (*Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 74. Accord, 1 Dooley 70-73. See 1 Dooley at 394.) I note too the second Restatement:

> "One who undertakes, *gratuitously or for consideration*, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to *exercise reasonable care* to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking." (Emphasis added.) (Restatement (Second) of Torts sec. 323 (1965).)

I agree with the majority's dismissal of Interstate's contention that it has not undertaken the obligation of "protection of persons" because that provision in the contract is in the preamble, at the behest of the Authority, rather than in the specific clauses of the contract. The majority accurately responded to that contention. I also agree, therefore, that Interstate had the duty of exercising reasonable care in the performance of its contracted obligation to protect persons lawfully on Authority's property. The factual question remains, whether that duty was breached.

For these reasons, I dissent in part, but would affirm the appellate court and would remand the cause to the circuit court.