974 So.2d 741 (2007)
Jania MARTIN and James Wesley.
v.
ILLINOIS CENTRAL RAILROAD COMPANY, National Railroad Passenger Corporation d/b/a Amtrak and Birmingham Steel Corporation.
No. 2006-CA-1495.
Court of Appeal of Louisiana, Fourth Circuit.
December 19, 2007.
*742 Todd R. Slack, James M. Williams, Gauthier Houghtaling & Williams, Metairie, LA, for Plaintiffs/Appellants.
Tobin J. Eason, Weiss & Eason, L.L.P., Mandeville, LA, for Defendant/Appellee.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE, Judge DAVID S. GORBATY, Judge LEON A. CANNIZZARO JR., Judge ROLAND L. BELSOME).
ROLAND L. BELSOME, Judge.
Plaintiffs-Appellants appeal the trial court's grant of a motion for summary judgment in favor of Defendant-Appellee. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
Plaintiffs-Appellants Jania Martin and James Wesley ("Appellants"), employees of National Railroad Passenger Corporation, d/b/a Amtrak ("Amtrak"), were injured in a collision between an Amtrak train and a truck driven by John Stokes on March 15, 1999 in Bourbannais, Illinois. Mr. Stokes drove his truck across a set of tracks in front of the train, causing the collision. The truck was loaded with steel that was sold by Defendant-Appellee Birmingham Steel Corporation ("Birmingham Steel"), who contracted with Melco Transfer, Incorporated ("Melco") to retrieve and deliver the steel to Gem City Steel ("Gem City"). Melco contracted with Mr. Stokes to transport the steel from Birmingham Steel to Gem City Steel.
Appellants filed suit against Birmingham Steel and several other Defendants. Birmingham Steel thereafter filed a motion for summary judgment that was ultimately granted by the trial court, dismissing Birmingham Steel and its insurers with prejudice. This appeal followed.
STANDARD OF REVIEW
Appellate courts review motions for summary judgment using the de novo standard. Reynolds v. Select Props., Ltd., *743 93-1480 (La.4/11/94), 634 So.2d 1180, 1183. The reviewing court must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" to find if genuine issues of material fact exist. La. C.C.P. art. 966(B). The "mover is entitled to judgment as a matter of law" if no genuine issues of material fact remain. Id. "A summary judgment may be rendered diapositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case." La. C.C.P. art. 966(E). The movant bears the burden of proof unless he "will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment." La. C.C.P. art. 966(C)(2). Next, the movant must establish "that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Id. "Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial, there is no genuine issue of material fact." Id.
APPLICABLE LAW
Regarding issues of conduct and safety, the rules of Louisiana Conflicts of Law state, in pertinent part:
Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct. In all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen the occurrence in that state. La. C.C. art. 3543. In this case, the conduct and injury occurred in Illinois; thus, the substantive law of Illinois applies.
DISCUSSION
Appellants' sole assignment of error asserts that the trial court erred in granting the motion for summary judgment because genuine issues of material fact exist. We disagree.
Appellants assert that the alleged evidence of Birmingham Steel's direct negligence precluded summary judgment. Specifically, appellants argue that Birmingham Steel had a duty to investigate Mr. Stokes' late arrival and to know that Mr. Stokes had not conformed to federal trucking regulations with respect to driving time limits. The Illinois Supreme Court has held that to properly state a cause of action for negligence under Illinois law, a claimant must establish the existence of a duty of care owed by the defendant, a breach of that duty, and an injury that was proximately caused by the breach, See, e.g., Wojdyla v. City of Park Ridge, 148 Ill.2d 417, 421, 170 Ill.Dec. 418, 592 N.E.2d 1098, 1100 (1992). Whether a duty of care exists in an action for negligence is a question of law that may be determined on a motion for summary judgment. Id.
We find that Appellants did not present any evidence demonstrating the existence of a duty on the part of Birmingham Steel to refuse to load Mr. Stokes' truck with steel on the night of the accident. Thus, at the outset, Appellants' argument fails to establish even the first prong of the negligence cause of action. See Milz v. M.J. Meadows, Inc., 234 Ill.App.3d 281, 175 Ill. Dec. 276, 599 N.E.2d 1290 (1 Dist.1992) (holding that an absence of duty entirely negates a cause of action for negligence); see also Mt. Zion State Bank *744 Trust v. Consolidated Communications, Inc., 169 Ill.2d 110, 116, 214 Ill.Dec. 156, 660 N.E.2d 863 (1995) ("[i]f no duty exists, it is axiomatic that no recovery can occur").
In this case, Birmingham Steel entered into a Transportation Agreement with Melco Transfer; Melco Transfer contracted with Mr. Stokes to employ him as a driver and to lease him a truck, Mr. Stokes was thus an independent contractor over whom Birmingham Steel had no control or contractual relationship. Therefore, no legal duty was established by Appellants on the part of Birmingham Steel pursuant to a contractual or agency relationship with Mr. Stokes. See Milz, supra.
The precise issue on appeal, however, is Appellants' failure to establish that a duty existed on the part of Birmingham Steel through either Charlene Cannon, Birmingham Steel's dispatcher, or David Beaupre, Birmingham Steel's general foreman of shipping. Appellants argue that the, deposition testimony of Ms. Cannon and Mr. Beaupre that Birmingham Steel had previously refused to allow a truck to be loaded with steel because of a driver's drunkenness and, on other occasions, because of improper truck conditions, thereby created a legal duty on the part of Birmingham Steel. Additionally, Appellants submit that Birmingham Steel, through its dispatcher/shipping clerk, Ms. Cannon, had a duty not only to ascertain whether Mr. Stokes had sufficiently rested pursuant to federal trucking laws and regulations, but also to refuse to load Mr. Stokes' truck with steel. Appellants' argument is flawed for several reasons.
First, Ms. Cannon testified that she was not trained with regard to federal regulations governing truck drivers, nor was she trained or instructed to question the drivers with regard to how many hours they had slept or worked in a given day. Second, Ms. Cannon testified that Mr. Stokes did not say at any point that he felt too tired to drive his truck, Ms. Cannon testified that. Mr. Stokes told her that he was, going to go home, get cleaned up and get on the road, because, according to Ms. Cannon's testimony, Mr. Stokes said that "if I go to bed now I probably wouldn't wake up in time to go, but if I get down the road a ways, I'll be all right." Third, Ms. Cannon also testified that Mr. Stokes told her that after he "g[o]t started down the road," that if he thereafter felt tired, he would pull over. Finally, and most significantly, Ms. Cannon plainly testified that Mr. Stokes did not look tired:
Q: Did Mr. Stokes look tired to you?
A: No.
Q: Have you seen drivers that come in that look tired?
A: Oh, yes.
Thus, we find it wholly illogical to conclude from Ms. Cannon's testimony that she could have had knowledge that Mr. Stokes might have been impaired by lack of sleep, particularly when it was Ms. Cannon's clear assessment that Mr. Stokes did not look tired.
Moreover, we do not agree that this is analogous to an instance where a truck driver arrives to pick up a load and is visibly intoxicated. To manipulate Birmingham Steel's policy against loading a visibly intoxicated driver's truck into a shipping clerk's legal duty to be omniscient with regard to any conceivable impairment that a driver may have defies reason.[1] *745 Similarly, a policy against loading a defective truck, or even a policy to refuse to load a truck for any reason, simply cannot be analogized to the facts of the instant case, where Mr. Stokes never indicated to Ms. Cannon that he felt too tired to drive, and where Ms. Cannon herself testified that, although dirty and running late, Mr. Stokes did not look tired. Accordingly, on these facts, we do not find that a legal duty existed on the part of Birmingham Steel for which a negligence claim could be properly asserted.
CONCLUSION
Because we find that no legal duty was established on the part of Birmingham Steel by Appellants, the judgment of the trial court is hereby affirmed.
AFFIRMED.
MURRAY, J., dissents for the reasons assigned by J. LOVE.
*746 LOVE, J., dissents and assigns reasons.
I respectfully disagree with the majority's assertion that no question of material fact exists as to Birmingham Steel's possible assumption of duty based on the facts and circumstances of the case sub judice.
Illinois law provides that "whether a duty of care exists is a question of law." Shank v. H.C. Fields, 373 Ill.App.3d 290, 311 Ill.Dec. 587, 869 N.E.2d 261, 265 (2007). Illinois jurisprudence dictates that a "duty may arise under common law where a person voluntarily undertakes a duty of care." Tedrick v. Cmty. Res. Ctr., Inc., 373 Ill.App.3d 761, 311 Ill.Dec. 747, 869 N.E.2d 421, 428 (2007). The Illinois Supreme Court referred to section 324A of the Restatement (Second) of Torts in order to examine and apply the theory of voluntarily undertaking a duty. Pippin v. Chicago Hous. Auth., 78 Ill.2d 204, 35 Ill.Dec. 530, 399 N.E.2d 596, 600 (1979). The Court referenced:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if:
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Id., quoting Restatement (Second) of Torts, sec. 324A (1965). Further, Illinois jurisprudence states that the party undertaking a duty is "subject to liability for bodily harm caused to the other if he fails to exercise due care or to act with the competence and skill that he possesses while performing the undertaking." Tedrick, 311 Ill.Dec. 747, 869 N.E.2d at 428. "[T]he scope of the duty is limited to the extent of the undertaking." Id. Additionally,
[o]ne having notice of facts which would put a prudent man on inquiry is chargeable with knowledge of other facts which he might have discovered by diligent inquiry. Whatever is notice enough to excite attention and put the party on his guard is notice of everything to which such inquiry might have led and every unusual circumstance is a ground of suspicion and demands investigation.
Miller v. Buffington, 381 Ill. 238, 44 N.E.2d 850, 852 (1942).
Ms. Cannon testified, in her deposition, that Mr. Stokes arrived in the shipping clerk's office approximately Seven hours later than usual. When she asked why he was late, she testified that he told her he was getting in from Dayton and was ready to take his next load to Dayton. She stated that Mr. Stokes looked dirty. Ms. Cannon also testified that Mr. Stokes told her that he was going home, but not going to sleep because if he did he would not be able to wake up in time to arrive in Dayton on schedule. However, she stated that he did not look tired.
Ms. Cannon testified that she did not receive any training and was not taught to ask the drivers how many hours they had driven in order to make sure that the drivers did not exceed the maximum driving hours provided for by federal regulations. In regards to impaired drivers, Ms. Cannon stated that if she did not think a driver looked "straight," then she would call the foreman to make a decision as to whether to load the driver's truck. She stated that Birmingham Steel had the *747 power to refuse to load a truck. Ms. Cannon remembered two occasions when a truck was not loaded because of the driver's drunkenness. Lastly, she stated that she does not know of Birmingham Steel refusing to load a truck because the driver appeared impaired by sleep.
David Beaupre ("Mr. Beaupre"), Birmingham Steel's general foreman of shipping, testified that he, remembers Birmingham Steel refusing to load a truck about three times due to impairment of the driver. Additionally, Mr. Beaupre cited the poor condition of a truck and the failure to follow Birmingham Steel's rules and regulations as reasons for past refusals to load a truck. He stated that, as general foreman, he has the authority to tell his bay leader not to load a truck. Further, John Donald Wilson, Birmingham Steel's director of transportation and logistics, testified that he remembered one truck not being loaded in Jackson, Mississippi because of the condition of the truck's trailer floor. Finally, William Turner ("Mr. Turner"), traffic manager for Birmingham Steel, also testified that Birmingham Steel has the right to refuse to load a driver. Later in his deposition, Mr. Turner stated that Birmingham Steel has "the right to refuse to load any driver."
The testimony of the Birmingham Steel employees above reveals a question of fact, under the facts and circumstances of this case, as to whether Birmingham Steel voluntarily undertook a duty and violated that duty, providing for liability, due to its alleged ability to refuse to load a driver due to driver impairment, improper truck conditions, or the failure to follow Birmingham Steel's rules and regulations.
NOTES
[1] Although it involves an employee who was not in the course and scope of her employment at, the time of the accident, we find Behrens v. Harrah's Illinois Corp., 366 Ill. App.3d 1154, 304 Ill.Dec. 303, 852 N.E.2d 553 (2006) noteworthy. In Behrens, plaintiff Barbara Behrens was an employee of Harrah's who was involved in a single-car accident on October 19, 1998. Prior to October 19, 1998, Ms. Behrens had worked several overtime shifts in a row, including a twelve and a half hour shift on October 18, 1998. Ms. Behrens alleged in her complaint that Harrah's was negligent for, inter alia, failing to assess the physical condition of its employees before the employees left work and that Harrah's alleged negligence was the proximate cause of her injuries.

Harrah's filed a motion to dismiss on the grounds that there was no legal duty in Illinois for an employer to safeguard an employee during travel to or from the workplace when that employee is not in the course and scope of his or her employment. The trial court dismissed the complaint with prejudice. On appeal, the court affirmed the dismissal of the complaint, noting that "[a]n employer should be able to presume that the person in the best position to avoid driving while excessively fatigued, the employee, will either ask for a ride from someone or pull off the roadway and rest if necessary." Behrens, supra at 1157[, 304 Ill.Dec. 303, 852 N.E.2d 553]. With respect to the onerous burden that would be placed on an employer had the court found that such a duty existed, the court stated:
The burden plaintiffs request us to place on an employer would be enormous. Would this duty be violated if the employee started the shift tired due to no fault of the employer? Or, would this duty only be violated if it is a policy of the employer that causes the injured party to lose sleep? If the latter is the case, would the duty be violated if the employee were to lay awake at night considering job-related duties and became tired, or would it only apply if the employee was tired due to the employee's presence at work for a certain amount of time? Undoubtedly, individual employees are in the best position to determine whether they are sufficiently rested to drive home safely. An employer is in a much inferior position when it comes to making this determination. Many people routinely work 12-hour "shifts," including lawyers, police officers, construction workers, doctors, and nurses, to name a few. As a matter of law, there is nothing unreasonable, by itself, about scheduling 12-hour "shifts." Even those working eight-hour "shifts" can become fatigued while at work, sometimes because of the nature of the work and other times because of reasons beyond the control of the employer, such as lack of adequate rest when not working, stress from family or social relationships, and the list goes on. Moreover, even if an employer did determine that an employee was too tired to drive home after the employee's shift, we are aware of no authority that would allow an employer to stop the employee from leaving the work place and driving home. Once the employee's workday has ended, the employer's ability to control physical conditions surrounding the employee is nonexistent. Faced with such a legal duty, would employers refuse to hire those with commutes of more than a few minutes, or even those not within walking distance of the place of employment? We believe that placing this burden on employers would be poor social policy that is likely to have an onerous impact, not only on employers, but also on the workforce.
Behrens, supra, at 1157-1158, 304 Ill.Dec. 303, 852 N.E.2d 553.