# Illinois Official Reports

## Appellate Court

***Blankenship v. Securitas Security Services USA, Inc.***, 2014 IL App (1st) 123749

| | |
|---|---|
| Appellate Court Caption | LESLIE BLANKENSHIP, Executrix of the Estate of Ellen Polivka, Plaintiff-Appellant, v. SECURITAS SECURITY SERVICES USA, INC., d/b/a Burns International Security Services, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-12-3749 |
| Filed<br>Rehearing denied | November 17, 2014<br>December 23, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a negligence and wrongful death action against the security service at a mental health facility where plaintiff's decedent worked as a part-time receptionist, the trial court properly entered summary judgment for the security service, notwithstanding plaintiff's contention that a genuine issue of material fact existed as to whether the security service had a duty to protect plaintiff's decedent when a patient entered the facility with an unmarked can of gasoline and a lit cigarette, doused decedent with the gasoline and set her on fire, since, based on viewing the stop motion snapshots of the patient on the security cameras they used, it was unlikely the security officers would have been suspicious and the post orders detailing the security officers' specific duties were formulated by the owners and operators of the facility, not the security service, and those orders were not included in the record; therefore, the appellate court would presume that the trial court's order had a sufficient legal and factual basis and that the security officers complied with their orders and performed their duties with reasonable care. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-05894; the Hon. William Gomolinski, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Corboy & Demetrio, P.C., of Chicago (Michael K. Demetrio, of counsel), for appellant.<br><br>Rutkowski Law Group, P.C., of Chicago (Anthony R. Rutkowski, of counsel), for appellee. |

| | |
|---|---|
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion. |

## OPINION

¶ 1      Plaintiff, Leslie Blankenship as executrix of the estate of the deceased, Ellen Polivka, appeals from the order of the circuit court granting summary judgment in favor of defendant, Securitas Security Services USA, Inc. (Securitas), on plaintiff's negligence and wrongful death claim. On appeal, plaintiff contends the court erred in granting summary judgment where a genuine issue of material fact exists as to whether Securitas undertook a duty to provide Ms. Polivka with security at the time and place she was attacked. For the following reasons, we affirm.

¶ 2                                 JURISDICTION

¶ 3      The trial court granted summary judgment in favor of Securitas on December 7, 2012. Plaintiff filed the notice of appeal on December 18, 2012. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

¶ 4                                 BACKGROUND

¶ 5      The decedent, Ms. Polivka, worked as a part-time receptionist for Centegra Health System (Centegra), which owns and operates a mental health facility at 527 South Street in Woodstock, Illinois. Centegra's director of safety and security, William Riggs, was responsible for creating a security plan for its facilities. At the South Street facility, the security plan called for two uniformed, unarmed security officers working eight-hour shifts. When not patrolling the premises, the officers were stationed in a specially designated security room located on the second floor. This room was not within view of the public and contained camera-monitoring equipment installed by outside contractors at Centegra's direction. The cameras provided still snapshots rather than continuous video. The security officers' duties included monitoring the cameras, conducting random patrols of the facility,

creating identification badges, and responding to calls for assistance by employees providing treatment to patients in the facility. Decisions regarding the number of security officers per shift, the precise patrol route and locations officers must follow, the formulation of post orders that outlined the officers' duties, the training required for security officers, and the type of uniforms worn were made by Centegra administrators.

¶ 6    In his deposition, Mr. Riggs stated that Centegra required security officers to wear "hard style" or police-style uniforms. Centegra chose this type of uniform because of the impact it would have on "violent and combative patients," who "respond better to authority when it looks like authority in the form of police." However, Centegra did not want the security officers stationed in main areas such as the main lobby. It did not want people coming into its facilities "to get the impression they were walking into a dangerous area or a police station." Therefore, the security officers were stationed in a room on the second floor, away from public view.

¶ 7    On July 1, 2004, Centegra executed a contract with Securitas to provide security services at its facilities pursuant to its security plan. The contract states that Securitas agrees to provide "uniformed security guard services to Centegra at the Facilities in substantial conformance with the duties, instructions, procedures, policies, and other provisions contained in the then current Centegra Policies and Procedures Manual, incorporated herein by this reference." It also states that Securitas "does not and will not under the terms hereof, or otherwise, provide or furnish any service that directly or indirectly requires armed personnel or guard animals." Furthermore, an amendment modifying the contract between Centegra and Securitas explicitly sets forth:

"[I]n no event will [Securitas] or its insurers be liable for any:

(a) Claim, loss, damage or expense arising from:

* * *

iii. An act of war, a violent or armed action, hi-jacking or act of terrorism[.]"

¶ 8    Lawrence Hucksteadt was a patient at Centegra facilities. Mr. Riggs and other Centegra security administrators stated that they had no prior knowledge of any incidents involving Hucksteadt at their facilities. On July 16, 2004, Hucksteadt participated in a treatment program in the basement of the South Street facility until noon, at which point he left treatment. According to the note in his records, Hucksteadt became angry and anxious and felt like he could not breathe. He stated that he was going to the Veterans Affairs (VA) hospital and would contact the counselor in a few days. On his disclosure form, Hucksteadt indicated that he did not want his participation in the outpatient behavioral services program disclosed to anyone. According to his treating physician, due to Hucksteadt's preference on the disclosure form, and the fact that when he left the program Hucksteadt did not voice any threat about himself or toward another individual, the physician did not share any information regarding Hucksteadt at the facility.

¶ 9    Ms. Polivka was at her station in the main lobby of the South Street facility on July 16, 2004. In the early afternoon, Ms. Polivka encountered Hucksteadt, who left the building without incident. Hucksteadt returned to the facility several hours later carrying a paint can and smoking a cigarette. He stayed around the front entrance before entering the lobby. He

then quickly entered the lobby, doused Ms. Polivka with gasoline from the can and set her on fire.

¶ 10    On July 16, 2004, Securitas security officers Matthew Tremethick and Adam Lockinger were on duty at South Street. Both were inside the security room on the second floor. Officer Tremethick had just returned from patrolling the facility to relieve Officer Lockinger, who was monitoring the cameras. Officer Lockinger was in the process of making an identification badge for a Centegra employee when Officer Tremethick noticed the fire in the main lobby on the monitor. Both officers went to the lobby, where they found fire and smoke. Officer Tremethick got a fire extinguisher and used it to douse the flames on Ms. Polivka. Officer Lockinger called for fire and ambulance assistance.

¶ 11    Kelly Lee-Wisz, a witness who was leaving the South Street facility as Hucksteadt entered, stated that she observed Hucksteadt walking into the lobby with a lit cigarette and a pail. Since she had a baby with her, she noticed his cigarette and thought it was strange that someone would walk into the lobby with a lit cigarette. She continued walking down the street until she heard screams, and when she looked back, she saw flames. Hucksteadt had doused Ms. Polivka with an accelerant contained in the unmarked pail and set her on fire. Ms. Lee-Wisz then saw Hucksteadt walk out quickly and she yelled out "that's him; he did it."

¶ 12    In her deposition, Laurie Parisi, Centegra's clinical manager, stated that prior to this incident she spoke to Hucksteadt on the phone approximately five times in the span of a week. Police had earlier removed Hucksteadt from another Centegra facility for "disruptive behavior" and he thought the hospital was seeking charges against him regarding the incident. He called to insist that Centegra drop the charges. Centegra, however, never filed charges against Hucksteadt regarding the "disruptive behavior" and removal.

¶ 13    On June 6, 2006, plaintiff filed her multiple-count wrongful death and survival action against Securitas. Both plaintiff and Securitas retained the services of expert witnesses on the issue of security services. Anthony Potter, plaintiff's expert, opined that Securitas was negligent in its actions and inactions surrounding the incident. He stated that a security guard must be proactive to detect problems and provide an effective level of deterrence. In his opinion, one of the officers should have been patrolling at the time, as opposed to both officers in the security room on the second floor. Mr. Potter also found their camera-monitoring training subpar. He believed that if one of the officers had been monitoring the entrance correctly he would have noticed Hucksteadt's suspicious behavior and confronted him before he could set fire to Ms. Polivka. Mr. Potter opined that the security officers' deficiencies in failing to observe Hucksteadt's suspicious behavior and react accordingly were the proximate cause of Ms. Polivka's death.

¶ 14    Securitas's expert, Francis Murphy, opined that at the time of the incident Centegra's security plan, monitoring equipment, and post orders were reasonable and adequate, and the officers had more than appropriate training for the job. He further concluded that the attack was not reasonably foreseeable and Securitas's officers reacted appropriately and consistently with Centegra's security plan and post orders and nationally accepted security practices. Securitas also retained the services of forensic behavioral science consultant Peter Smerick, who concluded that the incident was not foreseeable even though Hucksteadt has a criminal history. Also, Hucksteadt's history of disruptive behavior and "non-threatening" telephone calls occurring a month or more before the incident would not have put anyone on

notice that he would attack Ms. Polivka in such a violent manner. Hucksteadt's treating physician did not notice any "red flags" and Mr. Smerick opined that it was unrealistic to expect these security officers to anticipate violence from Hucksteadt when they did not have any information about him.

¶ 15 Securitas filed a motion for summary judgment, which the trial court granted. Plaintiff then filed a motion for reconsideration. In denying the motion to reconsider, the trial court determined that the contract between Centegra and Securitas "did not guarantee the personal safety of any person; and Securitas had no liability arising from criminal acts of third parties." It further found that Securitas's undertaking of services was limited to providing staffing with unarmed security guards and to maintain a presence. The trial court reaffirmed its finding that Securitas owed no duty to protect Ms. Polivka from Hucksteadt's attack. Plaintiff filed this timely appeal.

¶ 16                                                    ANALYSIS

¶ 17 Plaintiff contends that the trial court erred in granting summary judgment because an issue of material fact exists as to whether Securitas undertook a duty to provide security to Ms. Polivka and whether Securitas's employees were negligent in performing their duties. Summary judgment is granted only if the pleadings, depositions, and admissions on file, together with any affidavits, reveal no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). In deciding a motion for summary judgment, the evidence is viewed liberally in favor of the nonmoving party. *Id.* We review the trial court's grant of summary judgment *de novo*. *Fields v. Schaumburg Firefighters' Pension Board*, 383 Ill. App. 3d 209, 223 (2008).

¶ 18 In order to prevail in a negligence action, plaintiff must allege facts showing a duty owed by defendant to plaintiff, a breach of that duty, and an injury proximately caused by the breach. *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 349 (2003). "The existence of a duty depends on whether the plaintiff and the defendant stood in such a relationship to each other that the law will impose upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 421-22 (2004). Whether a duty of care exists is a question of law. *Marshall v. City of Centralia*, 143 Ill. 2d 1, 6 (1991).

¶ 19 Generally, one does not owe a duty of care to protect another from the criminal acts of third persons. *MacDonald v. Hinton*, 361 Ill. App. 3d 378, 382 (2005). The four exceptions to the rule are (1) when a special relationship exists between the parties and the harm is foreseeable; (2) when an employee faces imminent danger and this fact is known to the employer; (3) when a principal fails to warn an agent of an unreasonable risk of harm regarding the agency; and (4) when one party voluntarily or contractually assumes a duty to protect another from the acts of a third party. *Aidroos v. Vance Uniformed Protection Services, Inc.*, 386 Ill. App. 3d 167, 172 (2008). Plaintiff contends that the fourth exception is applicable here. She argues that Securitas had a duty to protect Ms. Polivka from the harmful acts of Hucksteadt because Securitas agreed to provide "security services" pursuant to its contract with Centegra.

¶ 20 In *Aidroos*, Navistar International Transportation Corp. (Navistar) hired defendant Vance Uniformed Protection Services, Inc. (Vance), to provide unarmed, uniformed security officers pursuant to the terms and conditions of their contract. *Aidroos*, 386 Ill. App. 3d at

168. The contract specifically states that the presence of security personnel " 'is designed to deter and reduce certain types of conduct and risks. However, [Vance is] not a law enforcement agency. *** [Vance does] not insure or guarantee the personal safety of any person or the security of any property. *** [Vance would] not have any liability arising from the criminal acts of any third parties.' " *Id*. at 169.

¶ 21    Navistar designed, installed, and maintained the keycard security system used to access various buildings, and it prepared the post orders that Vance security officers would follow in performing their duties. The post orders provided that security personnel would patrol Navistar's property and monitor employees, visitors, and vehicle traffic. Security officers performed these duties "to protect and prevent loss from fire, theft, sabotage, vandalism, or horseplay." *Id*. at 170. Furthermore, security officers should not allow anyone to bring items that might be harmful to Navistar or its employees, and discharged employees should not be admitted. *Id*. Vance's security officers were unarmed and communicated through the use of two-way radios. *Id*.

¶ 22    On the morning of February 5, 2001, Willie Baker, who had been discharged from Navistar in 1995, entered an unlocked door to the gate guardhouse. Baker carried a golf bag in which he concealed a gun. Security officer Latessa Diamond was on duty at the time and asked if she could help Baker. Baker told her that he wanted to drop the golf bag off with an employee. While Diamond looked at the employee directory, Baker put a gun to her head and forced her to walk with him to building 10. Although the door to that building was supposed to be locked, they entered without use of a keycard. Baker then proceeded to shoot randomly at employees in the building, killing four and injuring others before killing himself. *Id*. at 169.

¶ 23    The plaintiffs filed claims for negligence, wrongful death, and survival damages. They claimed that Vance owed a duty to protect Navistar employees when it voluntarily entered into the security services contract. Plaintiffs argued that Vance "implicitly agreed to protect plaintiffs when [it] undertook, contractually, responsibility to deter and reduce certain types of conduct and risks" including not permitting discharged employees to enter the premises. *Id*.

¶ 24    This court, however, found that the trial court properly granted summary judgment in favor of Vance because Vance owed no duty under the contract to protect the plaintiffs from the criminal acts of third parties. *Id*. at 175. It reasoned that under the voluntary undertaking theory of liability, the duty of care imposed upon Vance is limited to the extent of the undertaking. *Id*. at 173. The contract between Vance and Navistar specifically stated that Vance did not guarantee the personal safety of any person and had no liability arising from the criminal acts of third parties. Instead, "the extent of [Vance's] undertaking was limited to providing unarmed security officers who would maintain a presence, observe and report in order to deter loss from fire, theft, sabotage, vandalism, or horseplay." *Id*. at 174. Prior to this incident, Navistar had no history of workplace violence and the post orders did not require the security officers to keep the gate guardhouse door locked. Furthermore, since the record reflected that Diamond complied with the post orders on the day of the incident, the court determined that she performed her duties with reasonable care. *Id*. at 175.

¶ 25    Similar to the situation in *Aidroos*, Securitas' security officers wore uniforms but were unarmed, and Centegra was responsible for the design of the security system and procedures, and for the equipment. Pursuant to the contract, officers patrolled the premises following

- 6 -

routes dictated by Centegra, monitored the cameras, created employee identification badges, and responded to calls for assistance by employees providing treatment to patients in the facility. However, Centegra did not want the security officers stationed in main areas such as the main lobby. It did not want people coming into its facilities "to get the impression they were walking into a dangerous area or a police station." Therefore, the security officers were stationed in a room on the second floor, away from public view. The contract between Centegra and Securitas specifically states that Securitas "does not and will not under the terms hereof, or otherwise, provide or furnish any service that directly or indirectly requires armed personnel or guard animals." Furthermore, an amendment modifying the contract between Centegra and Securitas explicitly sets forth that "in no event will [Securitas] or its insurers be liable" for "any claim, loss, damage or expense arising from" a violent action.

¶ 26    Hucksteadt entered Centegra's South Street facility holding an unmarked pail and a lit cigarette. Although witness Kelly Lee-Wisz thought it was strange that someone would enter the facility with a smoking cigarette, she did not view the situation as dangerous and she kept walking away from Hucksteadt. Hucksteadt then proceeded to douse Ms. Polivka with an accelerant and set her on fire. Securitas did not contract with Centegra to provide protective guard services to Centegra personnel. To find that the security officers had a duty to protect Ms. Polivka from this horrifying and violent act would go beyond the extent of their contractual undertaking. Furthermore, the contract explicitly precludes liability for "any claim, loss, damage or expense arising from" a violent action. We find, as did the court in *Aidroos*, that Securitas did not owe a duty to protect Ms. Polivka from Hucksteadt's violent act.

¶ 27    The case plaintiff cites in support of her contention, *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204 (1979), is distinguishable from the case at bar. In *Pippin*, the contract specifically provided for guard and protection services from which our supreme court found that a security services company had a duty to protect persons lawfully on the premises from criminal conduct. *Id*. at 212. In making this determination the court relied on the same general principle cited in *Aidroos*, that a defendant's duty under a contract is limited to the extent of the voluntary undertaking. *Id*. at 210. As discussed above, the contract between Centegra and Securitas did not provide for such services.

¶ 28    Plaintiff also contends that the security officers negligently performed their contractual duties which proximately caused Ms. Polivka's injuries. Plaintiff argues that Securitas, pursuant to the contract, agreed to prevent access by unauthorized persons. Therefore, in her view, the security officers' responsibility is "to be proactive," to detect and deter threats, and "to respond to any type of threat." On the day of the incident, however, she claims the security officers did not pay close attention to the monitors and therefore missed observing Hucksteadt's suspicious activity. She also asserts they did not patrol the outside perimeter of the facility leaving that area "neglected and open for unauthorized individuals to roam."

¶ 29    We are not persuaded by plaintiff's arguments. Centegra, not Securitas, was responsible for designing the security plan used by Securitas, including the patrol route taken by the security officers and the post orders these officers must follow in performing their duties. The evidence shows that on the day of the incident, the officers patrolled the facility using the typical route of walking the hallways and corridors of each floor. At the time of the incident, Officer Tremethick had just returned from patrolling the facility to relieve Officer Lockinger, who was monitoring the cameras. Officer Lockinger was in the process of making

an identification badge for a Centegra employee when Officer Tremethick noticed the fire in the main lobby on the monitor. Both officers quickly went to the lobby where Officer Tremethick used a fire to douse the flames on Ms. Polivka. Meanwhile, Officer Lockinger called for fire and ambulance assistance. There is no evidence that Officers Tremethick and Lockinger deviated from their post orders on the day of the incident.

¶ 30    Furthermore, even if the security officers had monitored the cameras more carefully, they would not have been able to prevent Hucksteadt from setting Ms. Polivka on fire. Witness Kelly Lee-Wisz observed Hucksteadt walking into the lobby with a lit cigarette and a pail. Since she had a baby with her, she noticed his cigarette and thought only that it was strange someone would walk into the lobby with a lit cigarette. She, however, did not suspect that Hucksteadt was about to engage in criminal or violent activity because she continued walking down the street until she heard screams. If a witness directly observing Hucksteadt did not suspect he was a danger, it is unlikely the security officers would have sensed anything suspicious while viewing stop motion snapshots of Hucksteadt outside the facility.

¶ 31    Plaintiff also argues that the security officers should have been more "proactive" and performed activities to protect personnel and deter criminal activity. Plaintiff contends that Securitas agreed to provide such services through its post orders. As discussed above, Centegra formulated the post orders, not Securitas. Additionally, Securitas's statements that it would protect personnel and deter criminal activity come from its general mission statement, which was apparently attached to the actual post orders. However, the post orders detailing the specific duties of the security officers at Centegra's South Street facility are not included in the record. The appellant bears the burden of providing this court with a sufficiently complete record to allow for meaningful review. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Without a sufficiently complete record, a reviewing court will presume that the trial court's ruling had a sufficient legal and factual basis. *Id*. We find that the security officers complied with their post orders and performed their duties with reasonable care. See *Aidroos*, 386 Ill. App. 3d at 175.

¶ 32    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 33    Affirmed.